## THOMAS DZENUTIS ET AL. *v.* PETER DZENUTIS
## (12817)

PETERS, C. J., HEALEY, SHEA, SANTANIELLO and CALLAHAN, Js.

Argued April 9—decision released July 1, 1986

*Louis B. Blumenfeld,* with whom were *Karen Jansen Casey* and, on the brief, *John F. Scully,* for the appellant (defendant).

*John W. Pickard,* with whom were *David M. Cusick* and, on the brief, *Bridget G. Jenkins,* for the appellees (plaintiffs).

SHEA, J. The principal issue in this appeal is whether this court should continue to adhere to the doctrine of parental immunity from liability for negligence to an unemancipated minor child who was injured in the course of a business activity conducted by the parent away from the home. We conclude that in the limited context of the circumstances presented by this appeal the doctrine no longer serves the purposes for which it was designed and that we must, accordingly, modify the breadth of our decisions in previous cases that have unconditionally endorsed parental immunity as a defense to a negligence suit by a child.

In this action in behalf of a minor child, Thomas Dzenutis, for personal injuries arising from negligence, a jury returned a verdict of $70,000 against the defendant, Peter Dzenutis, his father. An additional sum of $6972.04 was awarded to the coplaintiff, Luigina Dzenutis, the mother of Thomas and wife of Peter, for medical expenses incurred in treating Thomas for his injuries. The trial court, after denying motions to set aside the verdict and for judgment notwithstanding the verdict, rendered judgment in accordance with the verdict. In his appeal the defendant claims the court erred: (1) in declining to grant judgment in his favor on the

ground of parental immunity, as sought in his motion for summary judgment and his postverdict motions; (2) in failing similarly to award him judgment because of the insufficiency of the evidence to establish the notice required for a finding of negligence; (3) in denying his request to charge upon the effect of Thomas' testimony as a judicial admission; (4) in rendering judgment for the coplaintiff Luigina, as the mother of Thomas, to recover the expenses for his medical treatment; and (5) in refusing to set aside or reduce the $70,000 award of damages as excessive. We find no error.

## I

In rejecting parent-child immunity as a defense to this action the trial court relied upon an exception to the doctrine that has been recognized in some jurisdictions for injuries received by a child that result from a negligent act of his parent occurring in the course of a business or vocational activity. Prosser & Keeton, Torts (5th Ed.) § 122, p. 906; annot., 6 A.L.R. 4th 1066, 1102–1107 (1981). The court also relied upon the fact that the defendant father carried a $300,000 liability insurance[1] policy affording coverage for claims arising in the conduct of his business as a general contractor. On appeal the defendant challenges these conclusions as wholly at variance with established precedent in this state.

---

[1] The information concerning the existence of liability insurance is contained in the defendant's response to an interrogatory pursuant to Practice Book § 230, which requires disclosure of the contents and limits of a liability insurance policy. The rule also provides that "[i]nformation concerning the insurance agreement is not *by reason of disclosure* admissible in evidence at trial." (Emphasis added.) Contrary to the defendant's assertion, the rule does not preclude the use of the disclosed information by the trial court in determining the legal issue for which it was used in this case. The rule is not intended to exclude evidence that is pertinent to the issues but to foreclose any claim that the requirement of such disclosure establishes the admissibility of the matters disclosed.

In *Mesite* v. *Kirchenstein,* 109 Conn. 77, 84, 145 A. 753 (1929), this court first adopted the rule barring an unemancipated minor child from suing his parent for injuries caused by the negligence of his parent. "Authority in the parent to require obedience in the child is indispensable to the maintenance of unity in the family. Anything which undermines this authority, brings discord into the family, weakens its government and disturbs its peace, is an injury to society and to the State. Few things could bring about this unhappy condition more quickly or widen the breach between parent and child further than the bringing of an action at law for personal injuries by a minor child against the parent. Such unseemly family discord is injurious to the public welfare, to such a degree that all the courts of this country, which have had occasion to express their opinion upon the right of the minor to maintain such an action, have declared that the exercise of this right is against sound public policy." Id., 84. The same considerations have been deemed to bar an action in the converse circumstance of a parent seeking to recover damages for personal injuries caused by the negligence of his unemancipated minor child. *Shaker* v. *Shaker,* 129 Conn. 518, 521–23, 29 A.2d 765 (1942).

This court, however, has refused to extend the doctrine of parent-child immunity to bar a suit by a child against the employer of the parent whose negligence in the course of his employment caused the child to be injured; *Chase* v. *New Haven Waste Material Corporation,* 111 Conn. 377, 380, 150 A. 107 (1930);[2] by a

---

[2] Some courts of other jurisdictions have concluded that the employer's right of indemnification against a negligent employee-parent for any judgment an injured child might recover against the employer necessitates, in order to preserve family harmony, denial of a recovery by a child against his parent's employer for a tort committed by his parent in the course of his employment. *Myers* v. *Tranquility Irrigation District,* 26 Cal. App. 2d 385, 79 P.2d 419 (1938); *Meece* v. *Holland Furnace Co.,* 269 Ill. App. 164 (1933); *Pinette* v. *Pinette,* 106 N.H. 345, 211 A.2d 403 (1965).

mother against her husband based upon the negligence of their minor son in operating an automobile owned by the husband, whose liability was predicated upon the family car doctrine; *Silverman* v. *Silverman,* 145 Conn. 663, 666–68, 145 A.2d 826 (1958); or by a child for injuries caused by the negligence of her sister, also an unemancipated minor. *Overlock* v. *Ruedemann,* 147 Conn. 649, 655, 165 A.2d 335 (1960). Prior to the adoption of parent-child immunity in *Mesite,* we had held in the analogous husband-wife context that the enactment of the Married Women's Act of 1877 gave a wife separate and independent legal status and thus abrogated the common law rule of spousal immunity both for intentional torts; *Brown* v. *Brown,* 88 Conn. 42, 47, 89 A. 889 (1914); and for negligent ones. *Bushnell* v. *Bushnell,* 103 Conn. 583, 587, 131 A. 432 (1925).

Though not oblivious to the "conglomerate of paradoxical and irreconcilable judicial decisions" in the intra-family setting that parent-child immunity has spawned; *Overlock* v. *Ruedemann,* supra, 654–55; this court has continued to adhere to the doctrine. *Ooms* v. *Ooms,* 164 Conn. 48, 51, 316 A.2d 783 (1972); *Begley* v. *Kohl & Madden Printing Ink Co.,* 157 Conn. 445, 254 A.2d 907 (1969). In 1967, however, the legislature abrogated the immunity for actions between parent and child "[i]n all actions for negligence in the operation of a motor vehicle," creating an exception that has since been extended to aircraft and boats. General Statutes § 52-572c; Public Acts 1967, No. 596; Public Acts 1979, No. 79-5. In *Begley* v. *Kohl & Madden Printing Ink Co.,* supra, 450 n.1, the court, rather than seize upon this enactment as an occasion to abolish the immunity wholly, commented that "[i]t is noteworthy that the General Assembly declined to modify the doctrine of parental immunity in any other respect" than "in all

actions for negligence in the operation of a motor vehicle . . . accruing after July 1, 1967."[3]

The history of the rise and decline of parent-child immunity nationwide has generally paralleled its course in this state. After the rule originated in Mississippi in 1891 in the case of *Hewlett* v. *George,* 68 Miss. 703, 711, 9 So. 885 (1891), it gained widespread acceptance. By 1929, when nonliability of a parent for personal injury to a child became the law in this state, the doctrine had been accepted in every one of eleven states where the issue had arisen. *Mesite* v. *Kirchenstein,* supra, 83. The rule, which has long been criticized by commentators, began to lose its judicial following after a Wisconsin decision in 1963 abrogated it entirely except as to the exercise of parental authority or parental discretion in the care of children. *Goller* v. *White,* 20 Wis. 2d 402, 413, 122 N.W.2d 193 (1963); Prosser & Keeton, Torts (5th Ed.) § 122, p. 907. The American Law Institute in 1977 rejected general tort immunity between parent and child, though recognizing the need for different treatment of some intra-family negligent torts involving parental duties or activities within the home. 4 Restatement (Second), Torts § 895G, comment k (1979). A growing number of states have now abrogated the doctrine in whole or in part either by statute or judicial decision. *Frye* v. *Frye,* 305 Md. 542, 505 A.2d 826 (1986); see annot., 6 A.L.R.4th 1066, 1113–25 (1981). For intentional torts involving mali-

---

[3] The court concluded in *Ooms* v. *Ooms,* 164 Conn. 48, 316 A.2d 783 (1972), that the negligence of a mother in stopping her car in a traveled lane of a highway to discharge her three year old daughter and in allowing the child then to cross the road unattended did not involve negligence in the operation of a motor vehicle and, therefore, did not fall within the exception created by General Statutes § 52-572c. In *Begley* v. *Kohl & Madden Printing Ink Co.,* 157 Conn. 445, 254 A.2d 907 (1969), which concerned a claim by a son against his father for negligent operation of a motor vehicle, the accident had occurred in 1961, prior to the effective date of § 52-572c, though the appeal was decided after that date.

cious or even criminal conduct, where the rule originated, it has now been generally repudiated. *Trevarton* v. *Trevarton,* 151 Colo. 418, 421, 378 P.2d 640 (1963); Prosser & Keeton, supra.

This striking turnabout in views concerning the threat to family harmony entailed by the litigation of tort claims between parents and children has stemmed largely from the increased availability of insurance to protect the family exchequer against the depletion that might otherwise result from substantial judgments against parents in such cases. It is not an obsolete notion that the satisfaction of a judgment for a minor child from assets of his parents needed for the support of the entire family would likely foment the "unseemly family discord" envisioned at the time this court first adopted parent-child immunity. *Mesite* v. *Kirchenstein,* supra, 84. The prospect of greeting an adolescent judgment creditor at the dinner table each day would likely strain the familial relationship even for the most saintly of parents. The presence of liability insurance, however, reduces the concern that the tranquility of the home will be disturbed or that parental authority will be undermined by prosecution of a child's suit for damages. 2 Harper, James & Gray, Torts (2d Ed.) § 8.11, pp. 574–76. Indeed, the defendant parent, whose delict is the basis for the suit, ordinarily has a substantial interest in the child's recovery, because the funds paid by the insurance carrier are commonly used to provide benefits to the child that his parent would otherwise have furnished from his own resources. The conception of liability insurance as simply a device to protect an insured against claims by those who would otherwise seek satisfaction from his personal assets is unduly narrow. One purpose a parent may have in carrying such insurance is to make available to family members, who would not otherwise be inclined to sue him, the

same resources to compensate them for accidental injuries as are provided for those who are strangers to him. To the extent that this broadened view of the purposes of liability insurance may adversely affect the companies that pay the claims, premium increases based upon actuarial experience afford a sufficient avenue of relief.

The legislature has chosen by enacting § 52-572c to abrogate parent-child immunity for negligence in the use of motor vehicles, aircraft and boats, where liability insurance is normally carried because of the risk of serious injury to the general public. For similar reasons, even during the heyday of parent-child immunity, several courts established a business activities exception, refusing to bar suits by children based upon the negligent act of a parent occurring in the course of his business or vocation. *Trevarton* v. *Trevarton*, supra; *Dunlap* v. *Dunlap*, 84 N.H. 352, 150 A. 905 (1930); *Signs* v. *Signs*, 156 Ohio St. 566, 103 N.E.2d 743 (1952); *Felderhoff* v. *Felderhoff*, 473 S.W.2d 928 (Tex. 1971); *Worrell* v. *Worrell*, 174 Va. 11, 4 S.E.2d 343 (1939); *Borst* v. *Borst*, 41 Wash. 2d 642, 251 P.2d 149 (1952). The general prevalence of liability insurance in the business activities setting has been viewed by these courts as removing any realistic threat to family harmony in actions against parents by their children. *Dunlap* v. *Dunlap*, supra, 368–72. The rationale has been that, if there is insurance, family discord is too remote a possibility; if there is none, unless the family is already divisive, the suit is not likely to be brought if family assets will be depleted. Id. Another consideration has been the incongruity of denying recovery because of a familial relationship between the victim and the tortfeasor for injuries caused by the breach of a duty owed to the general public upon which the relationship has no bearing. *Cummings* v. *Jackson*, 57 Ill. App. 3d 68, 372 N.E.2d 1127 (1978).

In the only case where the circumstances provided an occasion for this court to consider the business activities exception to the doctrine of parent-child immunity, it does not appear that the issue was raised. *Shaker* v. *Shaker,* supra; Connecticut Supreme Court Records and Briefs, A-180, pp. 246–92. The court did, however, expressly reject the argument that the common practice of carrying liability insurance for motor vehicle accidents invalidated the reasons for the immunity. *Shaker* v. *Shaker,* supra, 523–24. The more practical view subsequently taken by the legislature in enacting § 52-572c to remove the immunity for negligence in the operation of motor vehicles appears to have stemmed largely from awareness of the widespread prevalence of liability insurance for motor vehicle accidents. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1967 Sess., p. 369. We find the legislature's overruling of this aspect of the rationale in *Shaker* persuasive in this case upon whether to follow the courts that have established a business activities exception to parent-child immunity. The statutory removal of motor vehicles, aircraft and boats from the doctrine on the ground of the common availability of liability insurance for accidents occurring in those situations warrants reconsideration of the view expressed in *Shaker* that the frequent availability of liability insurance in particular situations is of no significance in deciding whether parent-child immunity should apply. As other courts have noted, the likely availability of insurance ordinarily removes the threat to family resources posed by a member's injury claim and thus dissipates the principal basis for concern that family discord will be generated. *Gibson* v. *Gibson,* 3 Cal. 3d 914, 922, 479 P.2d 648, 92 Cal. Rptr. 288 (1971); *Lusk* v. *Lusk,* 113 W. Va. 17, 19, 166 S.E. 538 (1932); 2 Harper, James & Gray, supra.

Additional considerations that have been mentioned as a basis for the doctrine—the undermining of paren-

tal authority, the possibility of fraud and collusion within the family against insurance companies, the ambivalent position of the insured family member who is obliged to cooperate with his liability carrier, the possibility of a recovery in excess of policy limits—have been viewed by most commentators as not of sufficient import to justify a bar against all intra-family suits regardless of individual merit. Prosser & Keeton, supra, p. 905; 2 Harper, James & Gray, supra. The same considerations apply with equal force to motor vehicles, aircraft and boat accident claims, where the legislature, having weighed the benefits of the immunity against its detriments, has chosen to repeal it.

Although we are persuaded that the likely availability of insurance coverage in particular situations, such as those recognized by § 52-572c, is pertinent in deciding whether parent-child immunity is applicable, we disagree with the trial court's view that the presence of insurance should be the touchstone of viability of an action by a child against a parent and that recovery should be limited to the insurance policy. In *Shaker* we rejected the claim that the outcome of a case should depend upon whether the defendant has insurance. We continue to believe that different rules of law should not be fashioned for the insured and the uninsured. We note that the legislature has made no such differentiation in the enactment of § 52-572c, which abrogates the immunity for motor vehicle, aircraft and boat accidents without regard to whether there may be insurance coverage. It would be inconsistent with the legislative scheme to make the applicability of parent-child immunity depend upon the availability of insurance in an individual case.

We conclude, nevertheless, that because of the general prevalence of liability insurance in the business activity setting, it is appropriate for us to recognize that in most instances family harmony will not be

jeopardized by allowing suits between parents and children arising out of business activities conducted away from the home, as in the case before us. The circumstances attending the injuries for which the plaintiffs seek redress here arise out of the contracting business that the defendant conducted as a sole proprietorship under the name Royal Construction Company Home Improvements. At the time of the accident the defendant was repairing a roof at the Northwest Community College in Winsted. The plaintiff, Thomas Dzenutis, the fifteen year old son of the defendant, was severely burned when he tripped over a bucket of hot tar that his father had left unguarded upon the sidewalk adjacent to the building upon which he was working. The mishap might well have occurred to any other member of the public who passed that way. The activity being conducted by the defendant as a contractor repairing a building is one where liability insurance is commonly carried. To allow a child to sue his parent for injuries received in the conduct of a business enterprise by the parent under the same circumstances as would permit a nonfamily member to bring an action is not likely to increase the exposure of liability carriers significantly in most instances. If the defendant had incorporated his business, retaining ownership of all the stock, no serious question could have been raised about the viability of a suit by his son against the corporation for the injuries he received. *Chase* v. *New Haven Waste Material Corporation,* supra, 382; *Foy* v. *Foy Electric Co.,* 231 N.C. 161, 56 S. E. 2d 418 (1949).

The defendant suggests that, even if an exception to parent-child immunity for business activities may be desirable, the action of the legislature in modifying the doctrine only for motor vehicle, aircraft and boat accidents indicates an intention to retain the rule in all other situations. There is, however, no record indicat-

ing that any legislative consideration was given to the proposed exception. We may infer from the enactment of § 52-572c in 1967 only that the legislature was dissatisfied with the application of the immunity in motor vehicle accident cases, the sole factual setting in which this court had at that time considered the doctrine. In this expression of the legislative will and also in the later amendments excluding aircraft and boat accident claims from the application of parent-child immunity, we perceive no indication that this judicially created doctrine should be excluded from modification through the processes that normally refashion judge-made law. Especially when this court has not previously considered whether a particular modification should be made in a general rule in the light of the facts presented on appeal, as in the case before us, we feel no inhibition in designing a rule of law most appropriate to the occasion.

We conclude, therefore, that the trial court did not err in refusing to apply parental immunity to bar the plaintiff's action.

II

The defendant claims next that the evidence was insufficient to prove that he knew or reasonably should have known of the plaintiff's presence on the property, as would be essential to give rise to a duty on his part to protect the plaintiff or that he breached any such duty.

From the evidence the jury could reasonably have found that, after lunch at his home in Norfolk, the plaintiff Thomas Dzenutis rode to Winsted with his father and brother, who were both going to the Northwest Community College, where they were repairing the roof of a building. He was left off at an auto parts store where he intended to purchase a part for his own automobile. His father and brother continued on to the job

site at the college about one and one-half or two miles away. Thomas intended to hitchhike back to his home, a distance of about ten miles, after making his purchase, as he had done on other occasions. No plans had been made to get a ride home with his father.

About three hours later, after walking around Winsted and attempting unsuccessfully to hitchhike, Thomas decided to walk to the college, where he knew his father was working, in order to get a ride home. As he walked along Main Street in Winsted, from a distance of about one hundred yards he saw his father and brother working on the roof of a building at the college. Across the street from this building were a McDonald's restaurant and a gasoline station. There were no fences around the property on which the building was situated nor any barriers around the parking lot next to the building, which was being used as a work site. The front door of the building was measured to be fifty-four feet from the public sidewalk on Main Street.

The defendant had left an uncovered five gallon bucket of tar heated to a temperature of 360° F close to a ladder near the front door of the building before climbing the ladder to go upon the roof. When Thomas arrived he walked along the sidewalk leading from Main Street to the front of the building toward the place where a tar cooker was located. He passed by the ladder leaning against the building and several buckets on the ground and proceeded to the corner of the building to look for his father. Not seeing him, Thomas returned to the ladder, where he took one or two steps backward as he looked up at the roof, tripped over the tar bucket his father had left near the ladder and fell. The bucket tipped and spilled hot tar upon his left arm and left side, causing severe burns.

We agree with the defendant that the evidence is inadequate to support a finding of actual notice or knowledge of Thomas' presence on the job site before the accident occurred. The defendant denied that he had seen his son approaching the building at the time Thomas, according to his testimony, from a distance of about one hundred yards, observed his father and brother on the roof. The plaintiffs argue that, since the jurors were not obligated to credit the defendant's testimony, even though uncontradicted, they could have inferred from the testimony that Thomas saw his father that the defendant saw his son as well. There is no merit in this contention. The fact that his son, as he walked along Main Street at a distance of one hundred yards, might have been visible from the roof of the building where his father was working is not a sufficient basis for a reasonable inference that the defendant actually saw his son and thus knew of his approach to the job site. Although it was within the province of the jury to believe or disbelieve the defendant's testimony, it could not, in rejecting his denial of having observed his son, have concluded that the opposite was true. *Snyder v. Pantaleo,* 143 Conn. 290, 294, 122 A.2d 21 (1960).

The trial court, in denying the defendant's post verdict motions, relied upon evidence that the defendant was aware that his son would have to hitchhike in order to return to his home in Norfolk. The court concluded that with this knowledge the defendant should reasonably have anticipated that his son would come to the job site to get a ride home. This basis for finding a breach of duty by the defendant seems to be more closely related to his obligation as a parent to provide for the care and welfare of his minor son than to his general duty as a contractor to avoid exposing members of the public to dangerous conditions created by the conduct of his business, for which we have now abrogated parental immunity. Although we agree with

the trial court that the evidence was adequate to support the verdict, we rely upon a different ground for the conclusion that the defendant should have used reasonable care to safeguard the tar bucket he left near the ladder.

This court has held that a contractor who comes upon land under a grant or license from the owner is subject to the same rules of liability for conditions he has created as those defining the duty of the landowner. *Duggan* v. *Esposito,* 178 Conn. 156, 159–60, 422 A.2d 287 (1979); *McPheters* v. *Loomis,* 125 Conn. 526, 533, 7 A.2d 437 (1939); 2 Restatement (Second), Torts § 384 (1979). We have also adopted the view of § 339 of the Restatement (Second) of Torts that "[a] possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children." See *Duggan* v. *Esposito,* supra, 158; *Kline* v. *New York, N.H. & H. R. Co.,* 160 Conn. 187, 191, 276 A.2d 890 (1970). The trial court charged the jury in accordance with these principles.

The defendant's claim of insufficient evidence focuses upon the first condition for application of the rule, that

the possessor must know or have reason to know that children are likely to trespass upon an area where a dangerous condition exists. In this connection we note § 369 of the Restatement (Second) of Torts, which subjects a possessor of land abutting upon a public highway to liability for injuries to children caused "by an artificial condition maintained by him on the land so close to the highway that it involves an unreasonable risk to such children because of their tendency to deviate from the highway." The bucket of tar that spilled on Thomas was located near the ladder, approximately fifty-four feet from Main Street, a major thoroughfare in Winsted. There were pedestrian sidewalks on both sides of Main Street. A McDonald's restaurant and a gas station were situated across the street from the building on which the defendant was working. The ladder and other equipment used by the defendant in repairing the roof were visible from the public sidewalk. The building and parking lot where the bucket was placed were part of the campus of Northwest Community College, a public institution. There were no fences or other barriers around the property on the area used as a job site by the defendant. It does not appear that the board of trustees of the college had posted any signs prohibiting trespassing or imposing restrictions on use of the roads or walks pursuant to its authority under General Statutes § 10a-79. The accident occurred in August during the school vacation period when children are more likely to wander during hours when construction work is in progress. Although there was no evidence that the defendant had actually seen children on the job site, he was chargeable with the knowledge that a reasonably prudent person would have gleaned from daily observation of the surrounding circumstances for two or three weeks before the accident while he had been working on the roof. We conclude that there was sufficient evidence

to support a reasonable conclusion by the jury that the defendant had reason to know that children were likely to trespass upon the area where the dangerous condition existed, as required by § 339.

The defendant also relies upon the principle that the duty to safeguard conditions that are hazardous to children "does not extend to those conditions the existence of which is obvious even to children and the risk of which should be fully realized by them." 2 Restatement (Second), Torts § 339, comment i; see *Dougherty* v. *Graham,* 161 Conn. 248, 251, 287 A.2d 382 (1971). The plaintiff Thomas testified that there had been nothing to prevent him from seeing the tar bucket over which he tripped as he stepped backward, that he had seen several buckets on the ground, but that he could not recall whether or not he had seen the precise bucket that caused his burns. The defendant argues that this testimony constituted a judicial admission that the bucket was an open and obvious condition such as would not give rise to a duty to safeguard the danger on the part of a land possessor. He maintains that the trial court should have charged accordingly. Even if the testimony were clear that Thomas had observed the very bucket that he tripped upon, or the tar that it contained, it would remain a question for the jury whether he or other children would have "fully realized" the risk created by a substance heated to 360° F. There is no evidence to indicate that the extremely high temperature of the tar was readily discernible. It cannot be said that the plaintiff was bound to appreciate the hazard to which he was exposed by the unguarded tar bucket.

III

Pursuant to a stipulation, the claim of the plaintiff Luigina Dzenutis, contained in the second count of the complaint, was not submitted to the jury but was decided by the court, which awarded her $6972.04 dam-

ages for medical expenses in the treatment of her son, Thomas.[4] The defendant, her husband, claims error in this award on the ground that the bills were addressed to him and that there was no evidence that the creditors looked solely to his wife for payment.

The defendant relies upon several cases in which we have held that in a personal injury action by a wife against her husband the medical expenses for her treatment cannot be recovered by her unless it appears that she, rather than her husband, will probably be required to pay them. *Silverman* v. *Silverman,* 145 Conn. 663, 669, 145 A.2d 826 (1958); *Warren* v. *Bridgeport,* 129 Conn. 355, 361, 28 A.2d 1 (1942); *Ginsberg* v. *Ginsberg,* 126 Conn. 146, 148, 9A.2d 812 (1939); *Bushnell* v. *Bushnell,* 103 Conn. 583, 596, 131 A. 432 (1925). "Services to a wife living with her husband made necessary by personal injuries which she has suffered are within the duty of a husband 'to support his family' as these words are used in the statute." *Katz* v. *Cohn,* 122 Conn. 338, 341, 189 A. 594 (1937). The statutes relied upon in those decisions, though making husband and wife jointly liable for goods or services provided for support of the family, imposed the primary obligation upon the husband, allowing the wife to be reimbursed by him for any payments she may have been compelled to make on such account. General Statutes (1949 Rev.) § 7308; *State* v. *Lugg,* 144 Conn. 21, 24, 127 A.2d 52 (1956). These statutes have now been supplanted by General Statutes § 46b-37, which expressly imposes liability for medical expenses incurred in the treatment of a husband, wife or minor child residing with its parents upon both husband and wife jointly. The provisions of earlier statutes making the husband primarily

[4] The court found the amount of the reasonable medical expenses to be $9961.22, but reduced this amount in accordance with the jury's finding that the plaintiff Thomas had been 30 percent contributorily negligent in causing his injuries to $6972.04.

responsible and allowing indemnification to the wife were eliminated in 1977. Public Acts 1977, No. 77-288.

We agree with the ruling of the trial court, therefore, in permitting recovery by the plaintiff Luigina of the medical expenses for treatment of her son against the defendant husband, who was also jointly liable for them. "When a minor child is injured by the negligent act of a third party, two causes of action immediately spring into existence; first, the right of action by the child itself for the personal injuries inflicted upon it; and second, a right of action to the parent for consequential damages, such as a loss of services and expenses, caused by the injury to the child." *Shiels* v. *Audette,* 119 Conn. 75, 77, 174 A. 323 (1934); see *Krause* v. *Almor Homes, Inc.,* 147 Conn. 333, 335, 160 A.2d 753 (1960). Although General Statutes § 52-204 authorizes the recovery of medical expenses in an action solely in behalf of the injured child and makes the recovery in such action a bar to any claim by the parent for such expenses, the statute does not mandate that procedure. *Quinn* v. *Gilormine,* 32 Conn. Sup. 156, 158, 344 A.2d 275 (1975). The plaintiff Luigina thus had a right to bring her action because of the liability imposed upon her resulting from the acts of her husband as the tortfeasor. "She may bring suit in her own name upon contracts or for torts . . . . " General Statutes § 46b-36. The marital relationship does not bar the suit. *Bushnell* v. *Bushnell,* supra, 587.

The additional circumstance, that the defendant husband was jointly liable with his wife for the medical expenses under the provisions of § 46b-37, also constitutes no barrier. Since it was the defendant's wrongful acts that precipitated this joint liability, she is entitled to seek indemnity from him, just as from any other person who had unlawfully caused her to incur such liability. 2 Restatement (Second) Agency § 401, comment d; Restatement, Restitution § 96 (1937).

## IV

With respect to the final claim of the defendant concerning excessiveness of the verdict, this court has been extremely reluctant to order modification of jury awards in personal injury cases, especially where the trial court has not considered the verdict to be excessive. *Henderson* v. *Levy,* 183 Conn. 517, 519, 441 A.2d 10 (1981) (per curiam); *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 458–59, 439 A.2d 408 (1981).

The jury evaluated the damages suffered by the plaintiff Thomas at $100,000 but deducted $30,000 because of his 30 percent contributory negligence, and thus awarded him $70,000. The finding that $100,000 constituted reasonable compensation for the injuries he sustained was based upon evidence that Thomas received primarily third degree burns over three-fourths of his left arm and over portions of his left side and back, involving full-thickness destruction of the skin in those areas; that the burns were very painful and required that morphine and Demerol be used to control pain; that two skin grafting operations under general anesthesia were necessary, requiring hospitalization of twenty-one days on one occasion and twelve days on another; that he has been permanently disfigured from numerous scars with keloid formations in the affected skin areas; that the scars continue to cause him embarrassment, though he exhibited no permanent functional disability; and that his schooling and participation in high school athletics was restricted during the period of his recovery.

The problems inherent in appellate review of claims of excessive damages in personal injury cases are greatly compounded where one of the principal elements of damages is disfigurement. The trial court and the jury have actually viewed the scarring that has

resulted from the burns and apparently concluded that Thomas' future would be adversely affected in substantial measure. "The ultimate test is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption." *Marin* v. *Silva,* 156 Conn. 321, 323, 240 A.2d 909 (1968). The trial court, with a closer view of the evidence, did not believe that the verdict exceeded the imprecise limits suggested by this guideline. We are not persuaded that this conclusion was erroneous.

There is no error.

In this opinion the other justices concurred.