Smith W. ROUSEY, Next Friend of
Cheryl T. Rousey, a Minor,
Appellant,

v.

Doris S. ROUSEY, Appellee.

No. 84–669.

District of Columbia Court of Appeals.

Reargued en banc June 23, 1986.

Decided June 23, 1987.

Aaron M. Levine, with whom Richard S. Schrager, Washington, D.C., was on brief, for appellant.

Frank J. Martell, Washington, D.C., for appellee.

Before PRYOR, Chief Judge, and NEBEKER, MACK, NEWMAN, FERREN, BELSON, TERRY, ROGERS, and STEADMAN, Associate Judges.

TERRY, Associate Judge:

Appellee, Doris Rousey, and her eleven-year-old daughter, Cheryl Rousey, were involved in an automobile accident in the District of Columbia. Cheryl sustained injuries, and through her father, Smith Rousey, she brought suit against her mother, alleging that the accident and her injuries were a direct and proximate result of her mother's negligence. Mrs. Rousey, who was insured by Government Employees Insurance Company and represented by its counsel, filed a motion for summary judgment on the ground that parental immunity barred appellant from suing his wife on behalf of their unemancipated daughter. The court granted the motion, and Mr. Rousey appealed to this court.

A division of the court, recognizing that the doctrine of parental immunity had never been established as the law of the District of Columbia, refused to adopt it and held that appellant was not barred from maintaining this suit against appellee, his wife, on behalf of their unemancipated minor child. *Rousey v. Rousey*, 499 A.2d 1199 (D.C.1985). That decision was vacated when the court decided to rehear this case en banc. *Rousey v. Rousey*, 507 A.2d 1046 (D.C.1986). A majority of the court en banc now concludes, as did the division, that the parental immunity doctrine is out of date. We decline to adopt it, choosing instead to follow section 895G of the RESTATEMENT (SECOND) OF TORTS (1979), which in our view sets forth a more appropriate legal standard. We therefore reverse the trial court's order granting summary judgment to appellee.

Unlike interspousal immunity, parental immunity was unknown at common law.

*See Petersen v. City and County of Honolulu,* 51 Hawaii 484, ——, 462 P.2d 1007, 1009 (1969). Interspousal immunity was based on the notion that husband and wife were legally one person,[1] whereas parent and child were never so regarded. Children, unlike wives, were entitled to own property and to enforce their own choses in action, including those in tort; likewise, they were liable as individuals for their own torts. *See, e.g., Lamb v. Lamb,* 146 N.Y. 317, 41 N.E. 26 (1895); *King v. Sells,* 193 Wash. 294, 75 P.2d 130 (1938); *see also* W. PROSSER & W. KEETON, THE LAW OF TORTS § 122, at 904 (5th ed. 1984) (hereinafter cited as PROSSER); RESTATEMENT, *supra,* § 895G, comment b.

The notion that a parent might be immune from liability for tortious conduct toward his or her child was not recognized in the United States until 1891, when the Supreme Court of Mississippi refused to permit a suit brought by a child against her mother, alleging that the mother had falsely imprisoned the child in an insane asylum. In ordering the suit dismissed, the court said:

> [S]o long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent.

*Hewellette v. George,* 68 Miss. 703, 711, 9 So. 885, 887 (1891). Although the court cited no authority for this proposition, courts in all but eight other states followed Mississippi's lead and adopted some form of parental immunity. *See* Hollister, *Parent-Child Immunity: A Doctrine in Search of Justification,* 50 FORDHAM L. REV. 489, 494 (1981–1982).

Various reasons have been advanced in support of parental immunity, but the reason most frequently cited by the courts has been the need to preserve domestic tranquility and family unity. *See, e.g., Downs v. Poulin,* 216 A.2d 29, 30 (Me.1966), *overruled, Black v. Solmitz,* 409 A.2d 634, 639 (Me.1979); *Luster v. Luster,* 299 Mass. 480, 481, 13 N.E.2d 438, 439 (1938), *overruled, Sorensen v. Sorensen,* 369 Mass. 350, 352, 339 N.E.2d 907, 909 (1975). Many courts have relied heavily upon the analogy between husband and wife, despite the obvious differences between the husband-wife relationship and the parent-child relationship. Because at common law husband and wife were treated as one person, a wife generally could not sue her husband. *See* PROSSER, *supra* at 901–902. Children, however, were never treated as mere extensions of their parents; they could even sue their parents in tort to protect their

---

1. This rationale began to be questioned after the widespread enactment of statutes known as Married Women's Acts, beginning in the mid-nineteenth century, which gave wives many of the rights that their husbands had always enjoyed. Some courts thus found it necessary to develop new theories to support the concept of interspousal immunity. The idea that most often found favor was that "personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home...." RESTATEMENT, *supra,* § 895F, comment d. Other courts, including this one, simply held that "[t]he common law rule forbid[ding] a wife to sue her husband for any tort committed against her ... [was] unaffected by the Married Women's Act." *Mountjoy v. Mountjoy,* 206 A.2d 733, 733 (D.C.) (citations omitted), *appeal denied,* 121 U.S.App.D.C. 27, 347 F.2d 811 (1965).

The common law doctrine of interspousal immunity was abolished in the District of Columbia by statute in 1976. D.C.Code § 30–201 (1981) now provides in pertinent part:

> The fact that a person is or was married shall not, after October 1, 1976, impair the rights and responsibilities of such person, which are hereby granted or confirmed, to ... engage ... in any civil litigation of any sort (whether in contract, tort, or otherwise) with or against anyone, *including such person's spouse,* to the same extent as an unmarried person.... [Emphasis added.]

Given this enactment, it would be anomalous indeed for this court to adopt parent-child immunity as the law of the District of Columbia when the most frequently cited rationale for that doctrine—the need to preserve domestic tranquility and family unity—has been rejected by our own legislature in abolishing interspousal immunity.

property rights. *See Petersen v. City and County of Honolulu, supra,* 51 Hawaii at ——, 462 P.2d at 1009 (citing cases). The situation with respect to personal torts is somewhat less clear, since there are very few reported cases, but there is little reason to doubt that the common law would permit actions for personal torts as well, subject only to the parent's right to enforce reasonable discipline against the child. *See* PROSSER, *supra* at 904. Thus we find the analogy to interspousal immunity to be a faulty one, providing no real justification for immunity between parent and child. Moreover, the courts that have adopted parental immunity have never adequately explained why the immunity applies only to suits in tort and not to suits involving property or contract rights. An action to enforce property or contract rights is surely no less adversarial than an action in tort, and in theory, at least, it would present the same threat to family harmony.

Of course, the analogy to interspousal immunity and the concern with domestic tranquility have not been the sole justifications for parental immunity. The courts have also expressed concern that parental discipline and control might be compromised if children were permitted to sue their parents. *See* Hollister, *supra,* 50 FORDHAM L. REV. at 504. Others believed that an uncompensated tort contributed to peace in the family and respect for the parent. *See* PROSSER, *supra* at 905. The absurdity of this reasoning, however, becomes plain when the case involves rape, *Roller v. Roller,* 37 Wash. 242, 79 P. 788 (1905), or a brutal beating, *Cook v. Cook,* 232 Mo.App. 994, 124 S.W.2d 675 (1939); *McKelvey v. McKelvey,* 111 Tenn. 388, 77 S.W. 664 (1903), or when the parent-child relationship has been terminated by death before the suit was filed. *Lasecki v. Kabara,* 235 Wis. 645, 294 N.W. 33 (1940).

Persistent criticism of the doctrine of parental immunity eventually led to its erosion through the creation of various exceptions to it.[2] One court asserted that parent-child immunity "should not be tolerated at all except for very strong reasons; and it should never be extended beyond the bounds compelled by those reasons." *Dunlap v. Dunlap, supra* note 2, 84 N.H. at 361, 150 A. at 909. Other critics of the doctrine went even further, arguing for its complete abandonment. *See, e.g.,* McCurdy, *Torts between Parent and Child,* 5 VILL.L.REV. 521, 529 (1960); McCurdy, *Torts between Persons in Domestic Relation,* 43 HARV.L.REV. 1030, 1079–1080 (1930); Comment, *Tort Actions between Members of the Family,* 26 MO.L.REV. 152, 187–193 (1961); Comment, *Parent-Child Immunity: The Case for Abolition,* 6 SAN DIEGO L.REV. 286, 295–296 (1969).

The courts of the District of Columbia were not faced with the issue until 1948, in a case in which a thirteen-year-old boy brought suit against his mother for injuries he suffered in an automobile accident. The accident occurred in Maryland, however, and hence the only question before the court was whether the son had a right to bring suit under Maryland law. After stating that the issue had not been decided in the District of Columbia and that it was "neither necessary nor proper ... to analyze the authorities, weigh the problem and announce a rule," the court concluded that decisions of the Maryland Court of Appeals "on kindred questions clearly indicate its accord with the overwhelmingly prevalent rule that public policy forbids such suits." *Villaret v. Villaret,* 83 U.S.App.D.C. 311, 312, 169 F.2d 677, 678 (1948).

Twenty years later a case came before Judge Holtzoff of the United States District Court for the District of Columbia in which a minor child had brought suit against her parents for injuries sustained in an automobile accident. Like the court in *Villaret,* Judge Holtzoff noted that the issue of parental immunity "has never been authoritatively determined in this jurisdiction." *Dennis v. Walker,* 284 F.Supp. 413,

---

2. *See, e.g., Dzenutis v. Dzenutis,* 200 Conn. 290, 512 A.2d 130 (1986) (no immunity when child's injury arose out of a business activity conducted by the parent away from the home); *Hale v. Hale,* 312 Ky. 867, 230 S.W.2d 610 (1950) (no immunity when death of either parent or child terminates the parental relationship); *Dunlap v. Dunlap,* 84 N.H. 352, 150 A. 905 (1930) (no immunity for intentional or reckless infliction of bodily harm).

415 (D.D.C.1968). The judge then examined at length the case law from many jurisdictions and decided to adopt the parental immunity doctrine, concluding that the "overwhelming weight of authority" favored such immunity because it served "to protect parental discipline, domestic felicity, and family tranquility and concord." *Id.* at 417. Judge Holtzoff acknowledged that personal injury actions, particularly those stemming from automobile accidents, were often defended by insurance companies, but held that this fact supported the principle of parental immunity:

> The presence of liability insurance ... may lead to fraud, or at least collusive, or at best friendly suits. A parent may encourage his minor child to bring such an action against him. This is not a far-fetched possibility. Not only is it contrary to good faith, but it also has the tendency of promoting cynicism and lack of integrity on the part of the child. The law should not encourage such activities. The parent in such a situation may be at times tempted to bring such a suit, because the judgment, if any, would have to be paid by the insurance company. He is likely to put himself into a position of conflict of interest, for he probably would not lend that cooperation to the insurance company which his policy requires.

*Id.; accord, Villaret v. Villaret, supra,* 83 U.S.App.D.C. at 313, 169 F.2d at 679.

Although the "overwhelming weight of authority" did at one time favor parental immunity, the doctrine began to lose judicial support after a 1963 Wisconsin decision which abolished it entirely except when the allegedly tortious act involved "an exercise of parental authority ... [or] ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." *Goller v. White,* 20 Wis.2d 402, 413, 122 N.W.2d 193, 198 (1963). In 1977 the American Law Institute completely rejected general tort immunity between parent and child when it published section 895G of the RESTATEMENT (SECOND) OF TORTS. That section states:

> (1) A parent or child is not immune from tort liability to the other solely by reason of that relationship.
>
> (2) Repudiation of general tort immunity does not establish liability for an act or omission that, because of the parent-child relationship, is otherwise privileged or is not tortious.

Many states have since followed the lead of *Goller v. White* and the Restatement, so that a substantial majority of states have now abandoned the doctrine in whole or in part. To date eleven states have abrogated it entirely or declined to adopt it;[3] eleven have abrogated it in automobile negligence cases;[4] five have abrogated it in automobile negligence cases in which the parent has liability insurance;[5] and seven have abrogated it except in cases in which the parent's alleged tortious act involves an exercise of parental authority over the child, or ordinary parental discretion with

---

**3.** *Gibson v. Gibson,* 3 Cal.3d 914, 479 P.2d 648, 92 Cal.Rptr. 288 (1971); *Petersen v. City and County of Honolulu,* 51 Hawaii 484, 462 P.2d 1007 (1969); *Anderson v. Stream,* 295 N.W.2d 595 (Minn.1980); *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013 (1974); *Briere v. Briere,* 107 N.H. 432, 224 A.2d 588 (1966); *Gelbman v. Gelbman,* 23 N.Y.2d 434, 245 N.E.2d 192, 297 N.Y.S.2d 529 (1969); *Kirchner v. Crystal,* 15 Ohio St.3d 326, 474 N.E.2d 275 (1984); *Winn v. Gilroy,* 296 Ore. 718, 681 P.2d 776 (1984); *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971); *Elam v. Elam,* 275 S.C. 132, 268 S.E.2d 109 (1980); *Wood v. Wood,* 135 Vt. 119, 370 A.2d 191 (1977).

**4.** *Hebel v. Hebel,* 435 P.2d 8 (Alaska 1967); *Streenz v. Streenz,* 106 Ariz. 86, 471 P.2d 282 (1970) (en banc); *Nocktonick v. Nocktonick,* 227 Kan. 758, 611 P.2d 135 (1980); *Transamerica Insurance Co. v. Royle,* 202 Mont. 173, 656 P.2d 820 (1983); *Nuelle v. Wells,* 154 N.W.2d 364 (N.D.1967); *Silva v. Silva,* —— R.I. ——, 446 A.2d 1013 (1982); *Smith v. Kauffman,* 212 Va. 181, 183 S.E.2d 190 (1971); *Merrick v. Sutterlin,* 93 Wash.2d 411, 610 P.2d 891 (1980); *Lee v. Comer,* 159 W.Va. 585, 224 S.E.2d 721 (1976); Conn.Gen.Stat. § 52–572c (Supp.1986); N.C. Gen.Stat. § 1–539.21 (1983).

**5.** *Williams v. Williams,* 369 A.2d 669 (Del.1976); *Ard v. Ard,* 414 So.2d 1066 (Fla.1982); *Farmers Insurance Group v. Reed,* 109 Idaho 849, 712 P.2d 550 (1985); *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975); *Unah v. Martin,* 676 P.2d 1366 (Okla.1984).

respect to such matters as food, care, and education.[6]

This trend toward abrogation is attributable, in large part, to the prevalence of liability insurance. *See, e.g., Williams v. Williams,* 369 A.2d 669, 672 (Del.1976); *Ard v. Ard,* 414 So.2d 1066, 1067–1068 (Fla. 1982); *Sorensen v. Sorensen,* 369 Mass. 350, 362, 339 N.E.2d 907, 914 (1975). The availability of insurance relieves the parents of direct financial responsibility for injuries sustained by their children, and thus substantially reduces the possibility that an action for damages will disrupt domestic tranquility or family unity. As the Supreme Judicial Court of Massachusetts wrote in *Sorensen:*

> When insurance is involved, the action between parent and child is not truly adversary; both parties seek recovery from the insurance carrier to create a fund for the child's medical care and support without depleting the family's other assets. Far from being a potential source of disharmony, the action is more likely to preserve the family unit in pursuit of a common goal—the easing of family financial difficulties stemming from the child's injuries.

*Id.* at 362, 339 N.E.2d at 914 (footnotes and citations omitted); *accord, e.g., Streenz v. Streenz,* 106 Ariz. 86, 88, 471 P.2d 282, 284 (1970) (en banc); *Nocktonick v. Nocktonick,* 227 Kan. 758, 767, 611 P.2d 135, 141–142 (1980); *Gelbman v. Gelbman,* 23 N.Y.2d 434, 438, 245 N.E.2d 192, 193–194, 297 N.Y.S.2d 529, 531–532 (1969); *Goller v. White, supra,* 20 Wis.2d at 412, 122 N.W.2d at 197.

Although there is a possibility that parent and child may conspire to defraud the insurance carrier or that the parent may fail to cooperate with the carrier as required under the insurance contract, *see, e.g., Dennis v. Walker, supra,* 284 F.Supp. at 417, that possibility exists to a certain extent in every case;[7] it hardly justifies a "blanket denial of recovery for all minors." *Sorensen, supra,* 369 Mass. at 363, 339 N.E.2d at 915; *accord, e.g., France v. A.P.A. Transport Corp.,* 56 N.J. 500, 505, 267 A.2d 490, 493 (1970); *Falco v. Pados,* 444 Pa. 372, 379–381, 282 A.2d 351, 355–356 (1971).

> We constantly depend on efficient investigations and on juries and trial judges to sift evidence in order to determine the facts and arrive at proper verdicts. As part of the fact-finding process, these triers of fact must "distinguish the frivolous from the substantial and the fraudulent from the meritorious." ... Experience has shown that the courts are quite adequate for the task.

*Sorensen v. Sorensen, supra,* 369 Mass. at 365, 339 N.E.2d at 914–915 (citations and footnote omitted).

 Because there is no controlling precedent on the subject of parental immunity,[8] we need not overrule any prior decisions. Rather, we simply decline to adopt the doctrine of parental immunity as the law of the District of Columbia. We acknowledge that doctrine for what it is: an outdated notion based on faulty premises. We see it as a vestige of an era in which children were without legal protection from the wrongs of their parents, and married women were without legal rights, subordinate to their husbands, all in the name of family harmony. More specifically, we are persuaded that section 895G of the Re-

---

**6.** *Turner v. Turner,* 304 N.W.2d 786 (Iowa 1981); *Rigdon v. Rigdon,* 465 S.W.2d 921 (Ky.App. 1970); *Black v. Solmitz,* 409 A.2d 634 (Me.1979); *Plumley v. Klein,* 388 Mich. 1, 199 N.W.2d 169 (1972); *Foldi v. Jeffries,* 93 N.J. 533, 461 A.2d 1145 (1983); *Felderhoff v. Felderhoff,* 473 S.W.2d 928 (Tex.1971); *Goller v. White,* 20 Wis.2d 402, 122 N.W.2d 193 (1963).

**7.** We think it significant that such a possibility of conspiracy between husband and wife did not dissuade the Council of the District of Columbia from abolishing interspousal immunity more than ten years ago. See note 1, *supra.*

**8.** Appellee erroneously asserts that the doctrine of parental immunity is "the established law of this jurisdiction." The decision in *Villaret v. Villaret, supra,* was based on Maryland law. *Perchell v. District of Columbia,* 144 U.S.App. D.C. 122, 444 F.2d 997 (1971), and *Dennis v. Walker, supra,* are not binding on this court. *See M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971). We have found no other reported cases in the District of Columbia dealing with this issue.

STATEMENT (SECOND) OF TORTS, *supra*, is jurisprudentially sound, and we accept it as a correct statement of the law applicable to cases such as this.[9]

Thus we reject appellee's argument that an unemancipated minor child should be barred, in the interest of family unity, from suing his or her parent for negligence. When a wrong has been committed between parent and child, "the harm to the family relationship has already occurred; and to prohibit reparations can hardly aid in restoring harmony." *Petersen, supra,* 51 Hawaii at ——, 462 P.2d at 1009. We see no reason, moreover, to limit our holding to cases in which the parent-defendant has liability insurance, as some courts have done.[10] There can be no justification for fashioning different rules of law for the insured and the uninsured. *See, e.g., Black v. Solmitz, supra* note 6, 409 A.2d at 639. The availability of insurance funds to satisfy a judgment should not determine the viability of an action by a child against a parent (or vice versa), nor should the judgment necessarily be limited to the amount of the insurance policy.

The order granting appellee's motion for summary judgment is reversed. This case is remanded to the Superior Court for further proceedings consistent with this opinion.

*Reversed and remanded.*

NEBEKER, Associate Judge, dissenting:

The majority gives all the appearances of being quite unsure about its new holding. In the face of a division opinion limiting suits by issue to automobile accidents covered by insurance, *Rousey v. Rousey,* 499 A.2d 1199 (D.C.1985), the majority now retreats from that unusual view to general amenability to suits by offspring. They then hedge, as does the RESTATEMENT, by

hinting at unknown exceptions where in the future we may conclude the case involves the type of conduct which may "on a case-by-case basis" be identified as "privileged or non-tortious." *Ante* at 421 note 9. The court thus behaves like an ill-advised legislature, acting broadly while it continues to study the need to make exceptions to the broad new enactment. This, in my view, is a poor way to take such a serious step. The hedging also implicitly recognizes that this question is for the legislature. Moreover, the majority chooses to ignore what to me are obviously damaging consequence to family structure and a moral imperative that compel the opposite conclusion.

In declining to adopt parental immunity, the majority disparages the wisdom of the past which championed the family unit, as if a contrary modern view is obviously superior. The majority finds solace in the fact that at common law there was no parental immunity and that children could enforce their own contract and property rights and bring their own action in tort. *Ante* at 416–417. This selective recourse to history ignores a body of law from the ecclesiastical courts where, in their domain, such suits were unthinkable. *See* McCurdy, *Torts Between Persons in Domestic Relation,* 43 HARV.L.REV. 1030, 1060 n. 141 (1930). The majority criticizes an analogy to spousal immunity and asserts that the rationales which support it are not applicable to parental immunity. *Ante* at 416–417. I agree with this point. Because the common law view of the husband-wife relationship differed from that of the parent-child, any justification by way of analogy is tenuous. Accepting this, however, I find somewhat perplexing the majority's process of rejecting parental im-

---

9. We emphasize that we are accepting section 895G in its entirety. We are aware that subsection (2) recognizes, or at least assumes, that certain acts or omissions may be privileged or non-tortious by reason of the parent-child relationship. We need not attempt in this case to identify the types of conduct that may be privileged or non-tortious under subsection (2); that will have to be done in the future on a case-by-case basis. As the Restatement tells us, "[t]hese

problems are comparatively new to the courts as a result of the recent abrogation of immunity, and the courts have not yet worked out a full analysis of the proper legal treatment." RESTATEMENT, *supra,* § 895G, comment k. We defer that "full analysis" until we are faced with a case that requires it.

10. See cases cited in note 5, *supra.*

munity by comparing it to the statutory abolition of spousal immunity in the District of Columbia in 1976.

But enough of their fallacious reasoning! The main concern is misguided policy. I view the fact that parental immunity did not exist at common law to be irrelevant because "no American child tortiously injured by his parents had ever sought to recover damages until late in the nineteenth century." Hollister, *Parent-Child Immunity: A Doctrine in Search of Justification*, 50 FORDHAM L.REV. 489, 498 (1981–1982). It seems that prior to 1891, our social and legal evolution had not "progressed" to the point that a child, or more accurately one in concert with him, could or would consider suing a parent in tort. The reason may have been that our society tolerated "almost unbridled parental authority," *id.* at 493, or that prior to our saturation with liability insurance, there was less incentive to sue. Of course, collusive actions were not permitted.[1] In any event, it appears the legal profession and a family oriented society simply deemed it unthinkable for a child to bring a tort action against his parent. Thus, the testing of liability was simply not contemplated. Accordingly, a doctrine of immunity would have been superfluous.

In 1891, when a tort claim was eventually brought by a daughter against her mother, the Supreme Court of Mississippi promulgated the doctrine of parental immunity. *Hewellette v. George*, 68 Miss. 703, 9 So. 885 (1891). Although it has been attacked as an "exception to the general rule of liability for negligently caused injury," Hollister, *supra*, 50 FORDHAM L.REV. at 504, parental immunity is more appropriately considered a judicial response to the latter-day attempt to pit child against parent and other family members. I see rejection of this immunity as part of the pandemic course to expand compensation for injury to yet another outer limit.

The likelihood of harm to the family structure if parrental immunity is rejected has summarily been dismissed by the majority—in a manner similar to the decisions from other jurisdictions which have undertaken to reject this immunity, *see Petersen v. City and County of Honolulu*, 51 Hawaii 484, ——, 462 P.2d 1007, 1009 (1969). Moreover, I submit that pointing to the familial discord which may also result from intentional, wanton or grossly negligent conduct is misdirected. The case before us is not one of an intentional or criminally reckless nature. Rather, it stems from an activity which today is essential to the functioning of a household—the operation of the family automobile. Anyone who has reared children today can attest to the near indispensability of the family car or cars.

I note that the majority seems to hope that family discord from offspring suits will be avoided because insurance will eliminate true adversity. It will not; and it will foster collusion. But liability insurance should not serve as the basis for rejecting the doctrine of parental immunity in any event. The majority notes the prevalence of liability insurance as its primary justification for creating new legal rights and duties within the family. I believe it imprudent public policy to sanction a new area of tort liability on the grounds that "[t]he availability of insurance relieves the parents of direct financial responsibility for injuries sustained by their children...." *Ante* at 420.

The theory of insurance is that it is supposed to give financial protection against the occurrence of a known risk. Once a type of insurance exists, it is not supposed to encourage the creation of new actions at law. The rationale in this case says, in essence, that because liability insurance exists, this jurisdiction will now create a new

---

1. "The cooperation clause [a requirement in the standard liability policy which requires the cooperation of the insured] will be deemed to be violated if the insured, by fraud or collusive conduct, assists the claimant in the maintenance of his suit, rather than the insurer." 8 J. APPLEMAN & J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4779 (1981). *See also Elliot v. Metropolitan Casualty Ins. Co. of New York*, 250 F.2d 680, 683 (1957) ("The inherent nature of the subject matter of automobile liability insurance necessitates the mutual obligation of cooperation between insured and insurer...."), *cert. denied*, 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958).

class of tort claimants who are eligible to recover because it is hoped most claims will be covered. It would be just as well for the majority to justify its new rule on the hope that suits will not be brought absent insurance coverage.

The whole principle of insurance becomes distorted when the presence of insurance encourages new kinds of liability. As additional types of liability are permitted by the court, the insurance companies must either raise policy premiums or exclude coverage as to that particular risk. This latter approach, which is both logical and lawful, if chosen, would eliminate the very reason for the court's holding in the first place. In the meantime, we encourage collusive suits where no adversity exists,[2] or pit family members against each other in true adversity.

Permit me to ask some unanswered questions where insurance is not a part of the scheme. Does our new rule permit actions for negligent failure to seek medical treatment or diagnosis, or to provide special education? Moreover, with abortions being lawful, may a child now sue a parent for wrongful birth if he is born with a foreseeable defect? Through a "case-by-case" process, we will find out sooner or later.

The rearing of a child is a unique and delicate responsibility. The teaching, nurturing and disciplining functions performed by every parent vary. They are a function of the social, economic and religious circumstances in every household. To subject a parent to liability based upon near indefinable standards will, I fear, have a detrimental impact on the family unit. The threat of a tort suit could shackle a parent and prevent the flexibility needed to exercise parental control. As a child progresses through the more intractable stages of adolescence, a parent's fear of being sued must clearly undermine the exercise of parental authority, and thus the family structure. These concerns loom larger as our society grows more litigious.

I fear the majority has thought precious little of the consequences. They would no doubt justify their holding on the ground that they simply compensate injury by making the one at fault pay. But how will this really work? In a family structure it is usual to have both parents share in the rearing function. If one parent causes an injury and is at fault, does the other parent owe a duty to the injured child to seek recovery? I suppose so, though we do not say so. If that parent, out of concern for other children or simple devotion to the other parent, or negligence, fails to pursue recovery until a case cannot be proved, what of that parent's liability? Can an older child, upon reaching majority, sue within the limitations period and deprive younger siblings of the family income or assets? I am sure the response is—"we will decide those cases later 'on a case-by-case basis.'" Such tinkering with the already fragile family structure by judges with no formal training or experience in such matters is ill-advised. It tears at family unity. With or without liability insurance, it unavoidably pits one child against any others for limited family resources and one parent against the other. At a time when families find it hard or impossible to exist without both parents working, we now create a competition for income within the family. And insurance is not the palliative. When a claim is made, the policy can be canceled or the premium increased. In automobile accidents this can be devastating to the family.

Moreover, I anticipate that pressure to sue one or both parents will strain the moral fiber which holds families together. Well-structured families will probably ignore our permissive holding. Those not so stable will find little solace in their lucre when they discover the inevitable decay in

---

2. "Because a child has only limited knowledge and ability in legal matters, the decision to sue is usually made by his parents." Hollister, *supra*, 50 FORDHAM L.REV. at 500. *See Streenz v. Streenz*, 106 Ariz. 86, 88, 471 P.2d 282, 284 (1970) ("Where [automobile liability] insurance exists ... in reality the sought after litigation is not between child and parent but between child and parent's insurance carrier."); *Sorensen v. Sorensen*, 369 Mass. 350, 362, 339 N.E.2d 907, 914 (1975) ("When insurance is involved, the action between parent and child is not truly adversary....").

their moral fiber. Should one of a number of children get a greater share of family assets or in some other way burden the others because one or both parents caused an injury? What "next friend" will make that choice and at what price within the family? I cringe at this holding and what it can mean to our most precious national resource—the family. It foists upon parents, or other family members such as grandparents, aunts and uncles, a choice that can only be described as damnable. What we have wrought I am not sure, but of this I am certain—it is an intruder into any family circle as much as any burglar or disease. And what is worse, it rides a steed called law.

I opt for immunity and family unity; so I dissent.

BELSON, Associate Judge, with whom Chief Judge PRYOR joins, dissenting:

I write separately because I prefer to state narrowly the reason I think this court should not abrogate the doctrine of parental immunity.

Although the majority opinion states that the doctrine of parental immunity has never been established in this jurisdiction, *see supra* at 420 n. 8, District of Columbia law, as reflected by decision and by practice, attests to the contrary. *Cf. Dennis v. Walker*, 284 F.Supp. 413, 415 (D.D.C.1968) (trial court recognizes doctrine of parental immunity in absence of appellate court authority). It is true that neither this court nor our federal counterpart has ever adopted expressly the doctrine of parental immunity. The United States Court of Appeals for the District of Columbia Circuit, however, twice has expressed its approval of the doctrine, and a decision of the United States District Court for the District of Columbia has adopted it affirmatively. *See Perchell v. District of Columbia*, 144 U.S. App.D.C. 122, 123–24, 444 F.2d 997, 998–99 (1971); *Villaret v. Villaret*, 83 U.S.App. D.C. 311, 311–12, 169 F.2d 677, 677–78 (1948); *Dennis v. Walker, supra*, 284 F.Supp. at 417.

In *Villaret*, a federal diversity case, the court applied the "overwhelmingly prevalent rule that public policy forbids" suits by minor children against their parents. 83 U.S.App.D.C. at 312, 169 F.2d at 678. Relying on this policy, the court held that, under Maryland law, the minor plaintiff had failed to state a claim against his mother upon which relief could be granted. *Id.* at 312–13, 169 F.2d at 678–79.

Next, in *Dennis v. Walker*, the District Court followed "the overwhelming weight of authority in this country" to hold that the doctrine of parental immunity should apply in the District of Columbia. 284 F.Supp. at 417. Since the minor plaintiff could not maintain a suit against her parents, the court reasoned, the defendant in that case could not seek contribution from the minor plaintiff's parents, whose negligence allegedly was a proximate cause leading to the plaintiff's injuries. *Id.* at 417–19.

Several years later, the United States Court of Appeals, by unmistakable implication, accepted the District Court's conclusion that minor children may not sue their parents in tort. *Perchell, supra*, 144 U.S. App.D.C. at 123–24, 444 F.2d at 998–99. The court expressly modified "[t]he doctrine of parental immunity as applied in *Dennis v. Walker*" to allow the defendant to sue for contribution from the minor plaintiffs' father, despite the fact that parental immunity barred the minor plaintiffs themselves from suing him. *Id.* at 124, 444 F.2d at 999. By so modifying the doctrine of parental immunity, the court implicitly acknowledged its existence in this jurisdiction. Although not binding upon this court, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), *Perchell* reflects what the state of the law regarding parental immunity has been in the District of Columbia.

Given this jurisdiction's consistent adherence, until now, to the doctrine of parental immunity, the majority decision's departure from the doctrine reflects a determination of public policy better suited to consideration by the District of Columbia Council. As an elected legislative body, the Council is in a better position to weigh competing policy considerations such as the potential for collusive lawsuits, divisiveness in fami-

ly structures, and the need to compensate tort victims.

For the reasons stated, I respectfully dissent.