### LISA ANN ASCUITTO *v.* CHARLES FARRICIELLI ET AL.
### (SC 15729)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and Peters, Js.

Argued December 2, 1997—officially released May 12, 1998

*Mary-Margaret Dalton*, for the appellant (plaintiff).

*Ruth Beardsley*, for the appellee (named defendant).

*Opinion*

KATZ, J. The issue in this appeal is whether the doctrine of parental immunity, which generally bars unemancipated minors from suing their parents for personal injuries, prevents a child of divorced parents from bringing a negligence action against a noncustodial parent for injuries the child sustained while in that parent's home during a scheduled visitation period. Specifically, we must decide whether the trial court properly granted the defendant father's motion for summary judgment based on the doctrine of parental immunity. We conclude that the doctrine of parental immunity applies and, accordingly, we affirm the judgment.

The record reveals the following facts. The plaintiff, Lisa Ann Ascuitto, and the named defendant,[1] Charles

[1] There were ten other defendants named in this action, including the city of West Haven, various city firefighters and fire officials, and a security company that had installed and monitored the fire alarms in the named

Farricielli, were divorced on September 18, 1990, after less than two years of marriage. The dissolution judgment awarded the plaintiff and defendant joint legal custody of their daughter, Ariana Gina Farricielli, who was born on December 28, 1988, but gave sole physical custody to the plaintiff. The defendant was ordered to pay child support in the amount of $150 per week and to pay for medical and dental insurance, unreimbursed medical expenses, day care costs, private schooling costs and college expenses. The defendant was awarded visitation rights, which increased as the child got older. At the time of the incident giving rise to the present action, Ariana normally stayed with the defendant three days a week during the school year and ten days each summer. The defendant has stated that his relationship with his daughter is close and the plaintiff has not disputed that characterization.

On August 22, 1994, a fire broke out in the defendant's home while Ariana was visiting him. In order to escape the fire, the defendant jumped from a second story window carrying Ariana in his arms. Ariana suffered various injuries in this fall including burns, permanent scarring and disfigurement, a fractured skull, pain and suffering and psychological trauma. The defendant carried insurance on his home and made a claim for property damage resulting from the fire. The record is silent, however, as to whether he carried liability insurance.[2]

The plaintiff filed an action on behalf of her daughter alleging, inter alia, that the fire was caused by the defendant's negligence in that: (1) the electrical system in his home had been installed and maintained improperly;

---

defendant's home. Those defendants were not involved in the summary judgment rendered in favor of the named defendant and are, therefore, not involved in this appeal. Hereinafter, references to the "defendant" are to the named defendant only.

[2] The parties do not dispute that Ariana was an unemancipated minor at the time of the injury and that she remains so today.

(2) he had overloaded the electrical system and improperly used extension cords; (3) he improperly installed and maintained smoke detectors; and (4) he carelessly had discarded a burning cigarette. The plaintiff has not alleged that the act of jumping from the burning building while carrying Ariana was negligent.

The defendant filed a motion for summary judgment claiming that the action against him was barred by the doctrine of parental immunity. The trial court granted the motion, and in its memorandum of decision stated that "the parental immunity doctrine protects a divorced parent who has joint custody of a minor child even when physical custody is primarily with another parent."[3] The plaintiff appealed from the trial court's judgment rendered in favor of the defendant to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

The plaintiff claims that the trial court improperly granted the defendant's motion for summary judgment because the doctrine of parental immunity does not apply in this case. The plaintiff argues: (1) the purpose behind the doctrine, which is to preserve family harmony, is not served where the parents are divorced and the child is suing the noncustodial parent; (2) the defendant's negligent acts did not concern parental supervision and discretion but, instead, posed a risk to the general public; and (3) the trial court failed to consider whether the defendant was covered by insurance.[4] We are not persuaded.

---

[3] Accordingly, the trial court did not assess the plaintiff's factual allegations of negligence.

[4] The plaintiff has not argued that the doctrine of parental immunity should be abrogated in its entirety. We, therefore, leave the questions raised by the dissent for another day.

"The standards governing . . . review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book § 384 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 744–45, 660 A.2d 810 (1995). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Id., 745. The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law; *D.H.R. Construction Co.* v. *Donnelly*, 180 Conn. 430, 434, 429 A.2d 908 (1980); and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Practice Book § 381. . . . *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 105, 639 A.2d 507 (1994). . . . *Doty* v. *Mucci*, 238 Conn. 800, 805–806, 679 A.2d 945 (1996)." (Internal quotation marks omitted.) *Thompson & Peck, Inc.* v. *Division Drywall, Inc.*, 241 Conn. 370, 374–75, 696 A.2d 326 (1997). The question of whether the doctrine of parental immunity applies to negligent acts by a noncustodial parent occurring in that parent's home is one of law and, therefore, appropriate for summary judgment. Accordingly, we review the issue de novo. *Squeglia* v. *Squeglia*, 234 Conn. 259, 262, 661 A.2d 1007 (1995).

Parental immunity from personal injury actions by unemancipated minor children was unknown at common law; W. Prosser, Torts (4th Ed. 1971) § 3; and was first applied in the United States as a common-law principle in 1891 in *Hewlett* v. *Ragsdale*, 68 Miss. 703,

711, 9 So. 885 (1891), overruled in part by *Glaskox* v. *Glaskox*, 614 So. 2d 906 (Miss. 1992). We first adopted the doctrine in *Mesite* v. *Kirchenstein*, 109 Conn. 77, 145 A. 753 (1929), and it remains the general rule in this state that unemancipated minor children and their parents may not sue one another for personal injuries. *Squeglia* v. *Squeglia*, supra, 234 Conn. 264–65 (despite modification, doctrine of parental immunity remains rule); *Begley* v. *Kohl & Madden Printing Ink Co.*, 157 Conn. 445, 450 and n.1, 254 A.2d 907 (1969) (declining to infer abolishment of parental immunity defense from legislative abrogation of doctrine in motor vehicle accidents); *Shaker* v. *Shaker*, 129 Conn. 518, 521, 29 A.2d 765 (1942) (parent cannot bring action against unemancipated minor child).

Courts have relied on a number of theories to justify barring personal injury actions by unemancipated minors against their parents. Among these are "[t]he danger of 'fraud' . . . the possibility that the defendant might inherit the amount recovered in case of the plaintiff's death, [and] that the family exchequer might be depleted at the expense of other children . . . ." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 122, p. 905. The primary rationale, however, and the one that this court has relied upon, is the preservation of family harmony and the protection of the parent-child relationship. "The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The State and society are vitally interested in the integrity and unity of the family and in the preservation of the family relation. The obligation of the father, or it may be the mother, to care for, guide, control and educate their child, and the reciprocal obligation of the

child to serve and obey the parent, are essentials of the family relationship. Authority in the parent to require obedience in the child is indispensable to the maintenance of unity in the family. Anything which undermines this authority, brings discord into the family, weakens its government and disturbs its peace, is an injury to society and to the State. Few things could bring about this unhappy condition more quickly or widen the breach between parent and child further than the bringing of an action at law for personal injuries by a minor child against the parent. Such unseemly family discord is injurious to the public welfare . . . ." (Internal quotation marks omitted.) *Mesite* v. *Kirchenstein*, supra, 109 Conn. 84. We have continued to adhere to the doctrine in light of the fact that "there are few things more disruptive of familial harmony than a legal action by an unemancipated minor child against a parent." *Squeglia* v. *Squeglia*, supra, 234 Conn. 265–66.

Because it is a common-law rule, the doctrine of parental immunity is subject to both legislative and judicial modification. Id., 264–65. In 1967, the legislature expressly abrogated the doctrine with respect to negligence in the operation of motor vehicles. Public Acts 1967, No. 596, § 1, subsequently codified as General Statutes (Rev. to 1968) § 52-572c. This exception was broadened in 1979, by Public Acts 1979, No. 79-5, to include aircraft and vessels.[5] We have not construed these legislative limitations as preempting our power to modify further this judicially created doctrine. *Dzenutis* v. *Dzenutis*, 200 Conn. 290, 301, 512 A.2d 130 (1986).

---

[5] General Statutes § 52-572c now provides: "Parent-child immunity abrogated in certain negligence actions. In all actions for negligence in the operation of a motor vehicle, and in all actions accruing on or after October 1, 1979, for negligence in the operation of an aircraft or vessel, as defined in section 15-127, resulting in personal injury, wrongful death or injury to property, the immunity between parent and child in such negligence action brought by a parent against his child or by or on behalf of a child against his parent is abrogated."

This court has relied on three primary factors in deciding whether to abrogate the doctrine of parental immunity: (1) whether the allegedly negligent act concerns parental discretion and supervision; *Squeglia* v. *Squeglia*, supra, 234 Conn. 269; (2) whether liability insurance covering the injury in question is prevalent in the circumstances under which the injury occurred; *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 299; and (3) whether the duty breached by the parent was a public one rather than one particularly owed to the child. Id., 300. In evaluating these factors, we have looked to whether the injury occurred in the family home as an indication of whether the parent's actions involved parental discretion and whether the duty breached was a public one. *Dubay* v. *Irish*, 207 Conn. 518, 525, 542 A.2d 711 (1988). All of these factors are relevant to the broader determination of whether application of the doctrine in the circumstances of a particular case will serve the underlying purpose of protecting the parent-child relationship and promoting family harmony.

Parental immunity has been judicially abrogated in two circumstances. First, we have held that the doctrine does not apply where the alleged negligence arose out of the parent's operation of a business when the injury occurred away from the home at the parent's place of business. *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 301. "In [*Dzenutis*], after having considered both the availability of insurance and the public nature of the duty involved, we declined to apply the parental immunity doctrine in situations involving tortious conduct by a parent arising out of business activities conducted away from home. In that case, the plaintiff had been severely burned when he tripped over a bucket of hot tar that his father, the defendant, had left unguarded on the sidewalk adjacent to the building upon which he was working. We based our decision on three factors. First, we determined that liability insurance was prevalent in

the defendant's line of business, which involved repairing buildings. We qualified this, however, by stating that the presence of insurance should not be 'the touchstone of viability of an action by a child against a parent . . . .' Id., 299. Second, we determined that 'in most instances family harmony will not be jeopardized by allowing suits between parents and children arising out of business activities conducted away from the home . . . .' Id., 299–300. Finally, we stated that the duty breached was owed to the public generally because '[t]he mishap might well have occurred to any other member of the public who passed that way.' Id., 300." *Squeglia* v. *Squeglia,* supra, 234 Conn. 267–68.

We also have declined to apply parental immunity to bar a suit by a child for sexual abuse, sexual assault or sexual exploitation by a parent. *Henderson* v. *Woolley,* 230 Conn. 472, 486, 644 A.2d 1303 (1994). In that case, we concluded that because "[f]amilial discord or dysfunction obviously exists where parental sexual abuse occurs"; id., 482; "the purpose of the doctrine would [not] be served by extending it to shield a parent from a civil action alleging sexual abuse." Id. Additionally, we noted that "[w]hen a parent perpetrates such a crime upon his or her child, that act constitutes a breach of the duty owed not only to the child, but to the public at large, and there is no reason to immunize such conduct from a civil action in damages merely because of the familial relationship." Id., 483.

The plaintiff has argued that the doctrine of parental immunity, which serves the purpose of protecting family harmony, should not bar a suit against a noncustodial parent because: (1) when the doctrine first evolved, the prevailing view of families did not include divorce; (2) when the parents are divorced, there is no longer any family harmony to protect; and (3) the noncustodial parent's home is not the family home. This line of argument fails to account for the many parents who strive

to maintain family relationships despite divorce, and also misperceives the underlying purpose of the doctrine.

The primary focus of the parental immunity doctrine in Connecticut is the protection of the relationship between the parent and the child. The protection of that relationship enables the parent to raise the child effectively without undue interference from the state. See *Mesite* v. *Kirchenstein*, supra, 109 Conn. 84 (recognizing that reciprocal obligations of parent and child are "essentials of the family relationship"); *Dubay* v. *Irish*, supra, 207 Conn. 527–28 (decrying unnecessary court interference in child rearing). We explicitly noted in *Mesite* that the obligation to "care for, guide, control and educate their child" may rest with "either" the father or the mother. *Mesite* v. *Kirchenstein*, supra, 84. It is clear, therefore, that the protected relationship is the one between the parent and the child and not primarily the relationship between the parents.

The plaintiff contends that the prevailing view of family life in existence at the time we adopted the doctrine of parental immunity did not include divorced parents or the formalized visitation orders that are often in place today. She apparently is arguing that the reasons supporting parental immunity do not apply in the context of divorce because the assumptions under which the doctrine evolved have changed, and because the social conditions that spawned it no longer exist. We disagree. We acknowledge that "[t]raditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents." *Michaud* v. *Wawruck*, 209 Conn. 407, 415, 551 A.2d 738 (1988).[6] The

---

[6] There has been a marked change in the composition of families in Connecticut. In 1980, married couple families with children under eighteen years of age comprised 81.8 percent of all families and female headed households with no husband present comprised 16.3 percent of families with children

fact that the composition of families has become more varied, however, has no bearing on their essential nature as families. A child has a familial relationship with both of her parents despite their divorce. While she is in the care of either parent, that parent must assume parental responsibility for her welfare. See *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 15, 438 A.2d 801 (1981) (noting that parents have responsibility to provide child with physical, educational, and emotional necessities). It would not serve our public policy of protecting the welfare of children to adopt a "narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development." *Michaud* v. *Wawruck*, supra, 415.

Furthermore, the doctrine of parental immunity, which protects family harmony by preventing discord between parents and children, is consistent with the policy of encouraging divorced parents to assume responsibility for their children. While divorce severs the marital relationship between parents, the parent-child relationship and the relationship between former spouses as parents remain. A divorce does not end the parents' responsibilities to the child. They continue to have the duty to provide shelter, food, educational and moral guidance, and affection while the child is in their care. *In re Juvenile Appeal (Docket No. 9489)*, supra, 183 Conn. 15. We recognize "the benefit that inures . . . when a good relationship is maintained after divorce." *Fugate* v. *Fugate*, 582 S.W.2d 663, 669 (Mo. 1979).

The plaintiff here could not reasonably argue, and she has not done so, that the defendant was absolved

under eighteen years of age. See 1980 Census of Population, Detailed Population Characteristics: Connecticut (U.S. Dept. of Commerce, Bureau of the Census 1983) table 209, p. 8-119. In 1990, those figures were 78.6 percent and 18.3 percent, respectively. See 1990 Census of Population, Social and Economic Characteristics: Connecticut (U.S. Dept. of Commerce, Bureau of the Census 1993) table 21, p. 59.

of these responsibilities by virtue of the divorce. He was awarded joint custody and extensive rights of visitation and clearly had a significant presence in his daughter's life. He helped to support her financially and continued to play an important decision-making role in matters relating to her education, health and general well-being. There is no reason to conclude that this personal injury action would be any less injurious to the child's relationship with her father than it would be had her parents remained married. Because it is clear that the relationship protected by the parental immunity doctrine in Connecticut is that between the parent and the child and not just the traditional nuclear family as a whole, the divorce of the parents itself does not eliminate the parental immunity doctrine when an unemancipated child sues his or her noncustodial parent.

Because we disagree with the plaintiff's argument that the child and her father do not comprise a family for the purposes of parental immunity, we also reject her argument that the child's injury did not occur in the family home. The defendant and his daughter have a familial relationship and his home is, therefore, the family home insofar as he shares it with her.

The plaintiff relies on three cases from other jurisdictions to support the proposition that parental immunity should not apply to the present case. One of these cases is not helpful because it concerns the application of a Louisiana statute specifically providing that parental immunity does not bar actions against noncustodial parents. *Bondurant* v. *Bondurant,* 386 So. 2d 705, 706 (La. App. 1980). In the two remaining cases, the Missouri Supreme Court and the Indiana Court of Appeals declined to apply parental immunity to personal injury actions brought against a noncustodial parent.

In *Fugate* v. *Fugate,* supra, 582 S.W.2d 663, the Missouri Supreme Court declined to bar a minor child's

statutory wrongful death action against her father for negligently causing the death of her mother in a motor vehicle accident.[7] The statute under which the action was brought permitted a "cause of action [by] a minor child 'in every case' that the decedent mother could have held a defendant father liable had death not ensued . . . ." Id., 665. The mother had been awarded "general care, custody and control" of the child "subject to certain visitation and temporary custody rights in the father." Id., 664. After first determining that the wrongful death statute did not abrogate the doctrine, the court concluded that "where the mother and father have been divorced the parent [who] does not have the primary, general custody of the unemancipated minor child at the time the tort occurs is not immune from suit in tort by the child." Id., 669. The court noted that, in determining whether parental immunity should be applied to the facts of the case, "the primary objective must be to decide the issues in the best interests of the family unit as it is that domestic establishment that is the subject of the public policy underlying parental immunity. Our society has evolved around the nucleus of the family unit. It is the family which produces and nurtures continuing generations of individuals from whom the fabric of society is formed." Id., 668. The court reasoned that the "family in its traditional sense" had already been disrupted by the parents' divorce and that the primary responsibility for raising the child rested with the mother. Id., 669. Although the court permitted this wrongful death action to go forward, it explicitly noted that a different result might be reached if the child had been injured while in the temporary care of her father. "[W]e do not intend in any way to denigrate the position or role of the noncustodial parent

---

[7] The Missouri Supreme Court has subsequently abolished the doctrine of parental immunity and replaced it with a reasonable parent standard. *Hartman* v. *Hartman*, 821 S.W.2d 852, 858 (Mo. 1991).

to the child. The instant case is one which clearly demonstrates the benefit that inures to both when a good relationship is maintained after divorce. We are also cognizant of the fact that a noncustodial parent must perform parental duties of care, discipline, etc., when the child is in that parent's temporary custody, and that the relative rights and duties may result in a modification or denial of recovery when the injury arises out of the performance of such duties." Id. This latter circumstance is precisely analogous to the present case.

In *Buffalo* v. *Buffalo*, 441 N.E.2d 711 (Ind. App. 1982), the Indiana Appellate Court abrogated parental immunity where an unemancipated minor child of divorced parents brought an action against his noncustodial father in negligence for injuries occurring when he was bitten by his father's dog. Although the mother had custody, the father had been awarded reasonable visitation. The incident giving rise to the action occurred while the child was with his father pursuant to those visitation rights. The Indiana Appellate Court, relying in part on *Fugate*, concluded that the reason for the doctrine no longer existed because the family unit had been broken and a new unit, consisting of the child and his mother, had formed. Id., 713. Because the mother bore the responsibility for the child's upbringing and discipline, the court determined that there was no logical reason to apply the doctrine to the noncustodial father. Id. We reject the reasoning in *Buffalo*, and agree with the dictum in *Fugate* insofar as that court declined to extend its holding to cases in which the negligence of the noncustodial parent occurred when the child was in that parent's temporary custody.

The plaintiff next argues that the doctrine of parental immunity is inapplicable to the present case because the defendant's acts do not concern the "day-to-day exercise of parental discretion," but, rather, involve the

breach of a duty owed to the general public. We disagree. We begin by noting that parental immunity applies unless an exception can be identified; *Squeglia* v. *Squeglia*, supra, 234 Conn. 264–65; and that acts of parental discretion generally are afforded special protection. *Dubay* v. *Irish*, supra, 207 Conn. 527–28. "Courts should not unnecessarily involve themselves in the day-to-day exercise of parental discretion regarding the upbringing and care of children. To do so would undermine parental authority in the very personal endeavor of child rearing and inject the machinery of the state into an area where its presence might be the occasion for family discord." Id. "Even in those jurisdictions that have, in part, abrogated parental immunity . . . the overwhelming majority of them have specifically retained the doctrine in the area of parental supervision, or have at least recognized that the doctrine may have continued validity where the negligent act involves the exercise of ordinary parental discretion with respect to the care and control of a minor child. In fact, although the American Law Institute rejected the parental immunity doctrine generally in 1977, today it continues to recognize the validity of the doctrine in situations where the alleged negligent conduct involves the exercise of parental authority or supervision. 4 Restatement (Second), Torts § 895G, comment k (1979)." *Dubay* v. *Irish*, supra, 526.

The fact that the incident occurred in the defendant's home reinforces the conclusion that it involved the exercise of parental discretion. *Squeglia* v. *Squeglia*, supra, 234 Conn. 268; *Dubay* v. *Irish*, supra, 207 Conn. 525. Even though the alleged negligence occurred in the home, however, we need not conclude automatically that parental discretion was involved. See *Henderson* v. *Woolley*, supra, 230 Conn. 472. It is the nature of the act and its relationship to the welfare and care of the child that are determinative.

The plaintiff urges us to conclude that, because the alleged negligent acts involve the defendant's responsibility for the structural safety of his home rather than discrete affirmative acts of negligent behavior that directly implicate his discipline or supervision of his daughter, they did not constitute an exercise of parental discretion. We disagree. The defendant, like all parents who have visitation rights, is obligated to provide an appropriate and safe place in which to exercise that right. In most circumstances, as in the present case, that place is the noncustodial parent's home. The manner in which the parent fulfills this duty certainly involves the exercise of discretion and judgment. See 4 Restatement (Second), supra, § 895G, comment (k) (despite generally recommending abrogation of parental immunity doctrine, Restatement would bar actions implicating duties such as "use of care to provide a safe place to live"); W. Prosser & W. Keeton, supra, § 122 (doctrine bars actions arising from common "household dangers" because they involve parental discretion). The maintenance of a safe and appropriate home environment requires a multitude of decisions influenced by a variety of factors including, but not limited to, finances, physical and emotional needs, cultural and religious factors, and personal preferences. See *Dubay* v. *Irish*, supra, 207 Conn. 527. "This maintenance of the home environment typifies the day-to-day exercise of parental discretion that the state would rather not disrupt." *Squeglia* v. *Squeglia*, supra, 234 Conn. 269. We therefore decline, under these circumstances, to parse the general duty to maintain a home for one's children into minute individual decisions and actions.

The plaintiff also argues that negligent acts creating a risk of fire breach a duty owed to the general public because anyone could have been hurt. Although this is certainly true, we conclude that it is not relevant to the present case. In *Squeglia* v. *Squeglia*, supra, 234 Conn.

264–65, a child brought an action against his father when he was bitten by the family dog. The dog could have bitten anyone, including those who were not members of the family. Nonetheless, because the decision to keep a dog and the manner in which this choice was exercised directly involved parental discretion, we determined that the defendant in that case had not breached a duty owed to the general public. Id., 268–69. In *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 297, on the other hand, we characterized the duty breached as one owed to the public at large. In that case, the child was injured when the parent left a bucket of hot tar on a public sidewalk outside his place of business. Id., 300. While we noted that the fact that anyone could have been hurt was a relevant factor; id.; that was not the touchstone of our decision. The decisive factors were that the injury occurred at a business location, that the incident involved an act directly related to that business enterprise, and our determination that business liability insurance was prevalent. Id. In the present case, the facts more closely resemble *Squeglia* than *Dzenutis*. We, therefore, conclude that the defendant did not breach a duty owed to the general public.

The plaintiff further argues that the trial court failed to consider the presence of insurance. Our reading of the record contradicts the plaintiff's argument. In fact, the trial court, in its memorandum of decision, expressly recognized this court's discussion of the relevance of insurance in *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 299–300, and noted that the plaintiff had placed the availability of insurance at issue. Indeed, although the availability of insurance has been a factor in our decisions addressing the applicability of the parental immunity doctrine, we have repeatedly said that it is not the primary or decisive factor. *Squeglia* v. *Squeglia*, supra, 234 Conn. 264–65; *Dubay* v. *Irish*, supra, 207 Conn. 524; *Dzenutis* v. *Dzenutis*, supra, 299. We have

expressly stated that "the presence of insurance should [not] be the touchstone of viability of an action by a child against a parent . . . ." *Dubay* v. *Irish*, supra, 524. Additionally, "different rules of law should not be fashioned for the insured and the uninsured." *Dzenutis* v. *Dzenutis*, supra, 299. Although we stated in *Dzenutis* that there are situations, such as in General Statutes § 52-572c, in which the likely availability of insurance is relevant, this is not one of them. Id.; see *Squeglia* v. *Squeglia*, supra, 268. As we stated in *Squeglia*, "determining rights based upon the availability of insurance is unsound. The plaintiff has . . . provided no hard evidence that homeowner's insurance is prevalent.[8] Notably, there is no statutory requirement that such insurance must be maintained. Indeed, it is reasonable to assume, and the plaintiff does not argue otherwise, that many households in Connecticut are not protected by homeowner's insurance . . . . We agree with the defendant that eliminating the doctrine under circumstances present in this case could improperly result in disproportionate benefits and burdens on those

[8] The dissent urges us to abrogate the doctrine of parental immunity where it has been demonstrated that insurance is available to cover any judgment against the parent. As we indicated in the text of this opinion, our conclusion in this case would be the same even if it had been established that the defendant carried liability insurance. We note, however, that the record in this case is barren of any evidence on the general prevalence of homeowner's liability insurance and the trial court made no findings of fact regarding this issue. We also note that, although the defendant testified that he carried homeowner's insurance and made a claim for property damage, the record is silent as to whether he carried liability insurance. Furthermore, the plaintiff conceded at oral argument that it was not clear from the defendant's testimony whether the insurance covered bodily injury and that she had failed to make the distinction between property and liability insurance.

The plaintiff has neither raised nor briefed the issue of abrogation of the doctrine, arguing instead that the doctrine is inapplicable under the narrow circumstances of this case. See footnote 4 of this opinion. Given the state of the record and the lack of briefing on this issue, we would be rendering an advisory opinion if we abrogated the doctrine based on the *probability* that a judgment against the defendant would be covered by insurance.

who are insured and those who are not. . . . We conclude, therefore, that the availability of insurance lends little weight to the claim that the doctrine of parental immunity should be jettisoned in this case." (Citation omitted.) *Squeglia* v. *Squeglia,* supra, 268.

We further note that the "unseemly discord" engendered by intrafamily lawsuits is not solely financial in origin. "The prospect of greeting an adolescent judgment creditor at the dinner table each day would likely strain the familial relationship even for the most saintly of parents." *Dzenutis* v. *Dzenutis,* supra, 200 Conn. 296. Although we have noted that this discord may be lessened by the presence of insurance; id.; the manner in which an adverse judgment is satisfied is not the sole, or even the primary, threat to family harmony that results when an unemancipated child brings an action against a parent.[9] Litigation is an intensely adversarial process requiring great discretion by all parties. The discord engendered by a lawsuit is not solely the result of the possibility of an adverse judgment against the parent. Allowing a child to testify, in a personal injury action, as to his or her parent's negligence would clearly strain and undermine the parent-child relationship because such testimony directly implicates that parent's ability to supervise and care for the child. Additionally, we recognize that attorneys frequently advise their clients not to communicate personally with opposing parties. The practical difficulties in maintaining this confidentiality between a parent and child would seem

[9] We, therefore, disagree with the dissent's assertion that "in negligence actions the risk of family discord is diminished by the fact that an adverse judgment typically will be satisfied by an insurance carrier, while in other kinds of actions an award generally must be paid by the defendant personally." A negligence action for personal injury uniquely implicates the parent's authority to care for his or her child in a way that is not inherently present in a property dispute. A negligence action is, therefore, especially likely to be disruptive of family harmony.

almost insurmountable. Because the presence of insurance would not lessen these difficulties, it cannot be the conclusive factor in determining whether to abrogate the doctrine of parental immunity.

In conclusion, the negligent acts alleged in the plaintiff's complaint did not constitute the breach of a duty owed to the general public. We also conclude that a parent's decisions affecting the maintenance of a safe and appropriate home constitute an exercise of parental discretion and are, therefore, particularly to be protected from court interference. Furthermore, divorce, in and of itself, is not so destructive to family harmony that the purpose of the doctrine of parental immunity is no longer served. Finally, unlike *Dzenutis*, this case does not present a situation in which the availability of insurance supports abrogating the doctrine of parental immunity. For the foregoing reasons we conclude that the doctrine of parental immunity bars the present negligence action.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN, NORCOTT, PALMER and PETERS, Js., concurred.

BERDON, J., dissenting. The majority continues to justify the doctrine of parental immunity based upon the rationale that it is necessary for "the preservation of family harmony and the protection of the parent-child relationship." The implausibility of this rationale is demonstrated when it is considered with respect to other litigation between parents and children that is not barred. As Professors Fowler Harper, Fleming James and Oscar Gray point out in their treatise on torts, "[a]ctions both at law and in equity have always been maintained between parent and child respecting the child's property rights, and courts have not hesitated to apply the usual principles merely because the parties

were in domestic relation."[1] 2 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 8.11, p. 572. Similarly, the law in this state permits actions in tort between parents and children when the injury arises out of the negligent operation of a motor vehicle, aircraft or vessel, and when the injury occurs at a place of business. Nevertheless, the majority would have us believe that in the interests of family harmony, other tort litigation between parents and children must be barred.

"The speculative theory of family disruption upon which the doctrine of parental immunity is largely based has been criticized and rejected by legal scholars without exception." *Falco* v. *Pados*, 444 Pa. 372, 379–80, 282 A.2d 351 (1971). "[O]ne state after another [has] reexamined and rejected broad parental immunity from liability for negligence, finding that the doctrine could not logically be supported by any reason that had been advanced for it." *Winn* v. *Gilroy*, 296 Or. 718, 726, 681 P.2d 776 (1984). Although all litigation between family members carries with it the risk of some disruption to family harmony, it is the wrongful infliction of the injury that constitutes the primary disruption to that harmony. *Falco* v. *Pados*, supra, 380. Exceptions to the general principle of liability for wrongdoing and the public policy favoring redress for injuries wrongly inflicted bear

---

[1] In abrogating the doctrine of parental immunity, the California Supreme Court reasoned that "[i]t would be anomalous for us to give greater protection to property rights than to personal rights." *Gibson* v. *Gibson*, 3 Cal. 3d 914, 919 n.7, 479 P.2d 648, 92 Cal. Rptr. 288 (1971). It also noted that " '[i]t is common knowledge that some of the most acrimonious family disputes have arisen in respect to property.' McCurdy, ['Torts Between Persons in Domestic Relation,' 43 Harv. L. Rev. 1030, 1075 (1930)]." *Gibson* v. *Gibson*, supra, 919 n.7.

When it abrogated the doctrine of parental immunity, the Pennsylvania Supreme Court reasoned that: "[The] law has never fashioned protection for parents against actions by their children involving property rights or breach of contract, where litigation can rise to great heights of antagonism. Yet, such protection has been created where the posture of the family is that of trying to repair a rupture by restoring one of its members to health." *Falco* v. *Pados*, 444 Pa. 372, 380, 282 A.2d 351 (1971).

a heavy burden of justification. The risk of any further disruption to family harmony beyond that already occasioned by the wrong cannot justify the decision to deprive individuals of a legitimate cause of action and redress for their injuries.[2]

The preservation of family harmony theory is particularly vulnerable when the injury is of a sort likely to be covered by insurance. The commentary to the Restatement (Second) of Torts points out that in negligence actions the risk of family discord is diminished by the fact that an adverse judgment typically will be satisfied by an insurance carrier, while in other kinds of actions an award generally must be paid by the defendant personally. See 4 Restatement (Second), Torts § 895G, comment (c) (1979); 2 F. Harper, F. James & O. Gray, supra, § 8.11, p. 576. This court similarly has recognized that "if there is insurance, family discord is too remote a possibility; if there is none, unless the family is already divisive, the suit is not likely to be brought if family assets will be depleted." *Dzenutis* v. *Dzenutis*, 200 Conn. 290, 297, 512 A.2d 130 (1986).[3]

---

[2] In deciding, in 1914, to allow a cause of action by one spouse against the other, this court reasoned that "[t]he danger that the domestic tranquility may be disturbed if husband and wife have rights of action against each other for torts . . . we think is not serious. . . . Courts are established and maintained to enforce remdies for every wrong . . . ." *Brown* v. *Brown*, 88 Conn. 42, 48–49, 89 A. 889 (1914). Several years later, the court observed that "the broad principle of liability announced in the *Brown* case . . . has not been questioned since, and the dangers from it which we then refused to regard as substantial have not in fact made themselves manifest." *Bushnell* v. *Bushnell*, 103 Conn. 583, 587, 131 A. 432 (1925).

[3] The majority claims that "the record is silent as to whether [the defendant] carried liability insurance." I read a different record. First, the trial court's memorandum of decision acknowledges that liability insurance would cover the defendant for this incident. Second, the defendant does not deny that the incident would be covered by liability insurance. Third, the majority concedes that the defendant had homeowner's insurance coverage and I take judicial notice that generally homeowners carry liability insurance as part of their overall homeowner's insurance policy.

More importantly, this court has pointed out that in considering whether to establish an exception to parent-child immunity, it is not the actual

Despite the profusion of criticism of the doctrine and the underlying theory upon which it is based, the majority would apply the doctrine in this case. According to the majority, the five year old child who was severely injured and scarred as a result of her father's alleged negligence—negligence that did not arise out of an exercise of parental authority or control but, rather, negligence that pertained to the improper maintenance of a home electrical system and the failure to employ a fire alarm system—must be denied compensation for her injuries in the interest of preserving family harmony. In cases such as this one, that interest is poorly served. First, the father's liability insurance would have assumed the burden of any judgment obtained by the child against him.[4] Second, the uncompensated injury of a child is at least as likely to impede the promotion or preservation of peace in the family as is an action between family members resulting in compensation. Indeed, where there is insurance protection, a greater threat to family harmony exists when a suit is *not* allowed.

The fear of fraudulent actions between family members also fails to justify the continued preservation of the doctrine. The risk of collusion is no greater in an action by a minor child against a parent than in an

presence of insurance in any particular case, but "the likely availability of insurance coverage in particular situations, such as those recognized by § 52-572c, [that] is pertinent in deciding whether parent-child immunity is applicable . . . ." *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 299; see id., 299–300 ("[w]e conclude, nevertheless, that because of the general prevalence of liability insurance in the business activity setting, it is appropriate for us to recognize that in most instances family harmony will not be jeopardized by allowing suits between parents and children arising out of business activities conducted away from the home").

Ironically, the result of the majority's decision in the present case is that the defendant was able to make an insurance claim for the physical damage to his home, but was not able to make a claim for the physical injury to his daughter's person.

[4] See footnote 3 of this dissent.

action between a husband and a wife, between two siblings, between a parent and an adult child, or for that matter, between a parent and an unemancipated minor child when the negligence arises out of an automobile accident, and all of those actions are permitted in this state. In abrogating the doctrine of parental immunity in 1971, the California Supreme Court acknowledged that "[t]he possibility of fraud or perjury exists to some degree in all cases. But we do not deny a cause of action to a party because of such a danger. . . . It would be a sad commentary on the law if we were to admit that the judicial processes are so ineffective that we must deny relief to a person otherwise entitled because in some future case a litigant may be guilty of fraud or collusion. . . . Our legal system is not that ineffectual." (Internal quotation marks omitted.) *Gibson* v. *Gibson*, 3 Cal. 3d 914, 920, 479 P.2d 648, 92 Cal. Rptr. 288 (1971).[5]

I will not restate the history of the adoption of parent-child immunity in this state which we have repeatedly set forth; see *Squeglia* v. *Squeglia*, 234 Conn. 259, 263–65, 661 A.2d 1007 (1995); other than to remind the reader that it is a judicially crafted doctrine. See *Mesite* v. *Kirchenstein*, 109 Conn. 77, 145 A. 753 (1929). Many states either have never adopted parental immunity or have completely abrogated the doctrine.[6] Only six states

---

[5] This court recognized and rejected the possibility of collusion as a basis for justifying immunity between siblings: "Courts and juries are frequently called upon to uncover fraud perpetrated in the infinite variety of forms which human ingenuity can devise. There is no reason why they could not as well discover its practice within the family circle." *Overlock* v. *Ruedemann*, 147 Conn. 649, 654, 165 A.2d 335 (1960), citing *Midkiff* v. *Midkiff*, 201 Va. 829, 833, 113 S.E.2d 875 (1960).

[6] The following jurisdictions never adopted the parent-child immunity doctrine: *Rousey* v. *Rousey*, 528 A.2d 416 (D.C. App. 1987) (en banc); *Petersen* v. *Honolulu*, 51 Haw. 484, 462 P.2d 1007 (1969); *Nocktonick* v. *Nocktonick*, 227 Kan. 758, 611 P.2d 135 (1980); *Transamerica Ins. Co.* v. *Royle*, 202 Mont. 173, 656 P.2d 820 (1983); *Rupert* v. *Stienne*, 90 Nev. 397, 528 P.2d 1013 (1974); *Briere* v. *Briere*, 107 N.H. 432, 224 A.2d 588 (1966); *Elkington* v. *Foust*, 618 P.2d 37 (Utah 1980); *Wood* v. *Wood*, 135 Vt. 119, 370 A.2d 191

presently retain full parental immunity,[7] while the remaining jurisdictions that had adopted the doctrine have since modified it.[8]

(1977). The following jurisdictions have completely abrogated the parent-child immunity doctrine: *Gibson* v. *Gibson*, supra, 3 Cal. 3d 914 (en banc); *Anderson* v. *Stream*, 295 N.W.2d 595 (Minn. 1980); *Guess* v. *Gulf Ins. Co.*, 96 N.M. 27, 627 P.2d 869 (1981); *Holodook* v. *Spencer*, 36 N.Y.2d 35, 324 N.E.2d 338, 364 N.Y.S.2d 859 (1974); *Nuelle* v. *Wells*, 154 N.W.2d 364 (N.D. 1967); *Kirchner* v. *Crystal*, 15 Ohio St. 3d 326, 474 N.E.2d 275 (1984); *Winn* v. *Gilroy*, 296 Or. 718, 681 P.2d 776 (1984); *Falco* v. *Pados*, 444 Pa. 372, 282 A.2d 351 (1971); *Elam* v. *Elam*, 275 S.C. 132, 268 S.E.2d 109 (1980).

[7] The six states that continue to recognize full, unrestricted parental immunity are: *Coleman* v. *Coleman*, 157 Ga. App. 533, 278 S.E.2d 114 (1981); *Vaughen* v. *Vaughen*, 161 Ind. App. 497, 316 N.E.2d 455 (1974); *Bondurant* v. *Bondurant*, 386 So. 2d 705 (La. App. 1980); *Warren* v. *Warren*, 336 Md. 618, 650 A.2d 252 (1994); *Rayburn* v. *Moore*, 241 So. 2d 675 (Miss. 1970); *Barranco* v. *Jackson*, 690 S.W.2d 221 (Tenn. 1985).

[8] The following jurisdictions have limited parent-child immunity: *Meyer* v. *State Farm Mutual Automobile Ins. Co.*, 689 P.2d 585 (Colo. 1984) (en banc), citing *Trevarton* v. *Trevarton*, 151 Colo. 418, 378 P.2d 640 (1963); *Ard* v. *Ard*, 395 So. 2d 586 (Fla. App. 1981), aff'd in part, 414 So. 2d 1066 (Fla. 1982); *Kendall* v. *Sears, Roebuck & Co.*, 634 S.W.2d 176 (Mo. 1982) (en banc); *Fugate* v. *Fugate*, 582 S.W.2d 663 (Mo. 1979) (en banc); *Silva* v. *Silva*, 446 A.2d 1013 (R.I. 1982); *Lee* v. *Comer*, 159 W. Va. 585, 224 S.E.2d 721 (1976); *Allstate Ins. Co.* v. *Wyoming Ins. Dept.*, 672 P.2d 810 (Wyo. 1983); see also N.C. Gen. Stat. § 1-539.21 (1997).

These jurisdictions specifically retain immunity in actions based upon the negligent exercise of parental authority: *Hebel* v. *Hebel*, 435 P.2d 8 (Alaska 1967); *Sandoval* v. *Sandoval*, 128 Ariz. 11, 623 P.2d 800 (1981); *Gibson* v. *Gibson*, supra, 3 Cal. 3d 914; *Dubay* v. *Irish*, 207 Conn. 518, 542 A.2d 711 (1988); *Schneider* v. *Coe*, 405 A.2d 682 (Del. 1979); *Farmers Ins. Group* v. *Reed*, 109 Idaho 849, 712 P.2d 550 (1985); *Larson* v. *Buschkamp*, 105 Ill. App. 3d 965, 435 N.E.2d 221 (1982); *Wagner* v. *Smith*, 340 N.W.2d 255 (Iowa 1983); *Rigdon* v. *Rigdon*, 465 S.W.2d 921 (Ky. 1970); *Black* v. *Solmitz*, 409 A.2d 634 (Me. 1979); *Sorensen* v. *Sorensen*, 369 Mass. 350, 339 N.E.2d 907 (1975); *Wright* v. *Wright*, 134 Mich. App. 800, 351 N.W.2d 868 (1984); *Foldi* v. *Jeffries*, 93 N.J. 533, 461 A.2d 1145 (1983); *Sixkiller* v. *Summers*, 680 P.2d 360 (Okla. 1984); *Felderhoff* v. *Felderhoff*, 473 S.W.2d 928 (Tex. 1971); *Wright* v. *Wright*, 213 Va. 177, 191 S.E.2d 223 (1972); *Goller* v. *White*, 20 Wis. 2d 402, 122 N.W.2d 193 (1963).

The following jurisdictions have full immunity except for torts involving wilful, wanton or intentional conduct: *Hurst* v. *Capitell*, 539 So. 2d 264 (Ala. 1989); *Carpenter* v. *Bishop*, 290 Ark. 424, 720 S.W.2d 299 (1986); *Pullen* v. *Novak*, 169 Neb. 211, 99 N.W.2d 16 (1959); *Talarico* v. *Foremost Ins. Co.*, 105 Wash. 2d 114, 712 P.2d 294 (1986) (en banc).

Since the adoption of parent-child immunity in this state by judicial fiat; *Mesite* v. *Kirchenstein*, supra, 109 Conn. 77 (parental immunity); see *Shaker* v. *Shaker*, 129 Conn. 518, 29 A.2d 765 (1942) (child immunity); the legislature and this court have riddled the familial immunity doctrines, including that of parent-child immunity, with exceptions that have undermined the very essence of the stated purpose underlying the doctrines—the preservation of family harmony.

The legislature removed the parent-child immunity defense when the injury arises out of the negligent operation of a motor vehicle, an aircraft or a vessel.[9] General Statutes § 52-572c. Early on, this court rejected the doctrine of spousal immunity and held that a married woman could recover damages from her husband for an assault; *Brown* v. *Brown*, 88 Conn. 42, 47, 89 A. 889 (1914); and that she could recover damages for personal injuries sustained as a result of her husband's negligent operation of a motor vehicle in which she was a passenger. *Bushnell* v. *Bushnell*, 103 Conn. 583, 587, 131 A. 432 (1925).

In rejecting immunity between siblings, what this court had to say in *Overlock* v. *Ruedemann*, 147 Conn. 649, 165 A.2d 335 (1960), is particularly germane to the present case. Chief Justice Baldwin, for a unanimous court, wrote: "We see no logic or reason in affording an immunity when the plaintiff and the defendant are unemancipated minor children in the same family. . . . The idea that a lawsuit between members of the same family would be disruptive of family unity was created by the courts and became the basis for the common-law rule that such an action is contrary to public policy. . . . But the tendency has been to whittle away the

___

[9] A "vessel" is defined in General Statutes § 15-127 as "every description of watercraft, other than a seaplane on water, used or capable of being used as a means of transportation on water."

rule by statute and by the process of interpretation, distinction and exception, until we have today a conglomerate of paradoxical and irreconcilable judicial decisions. Family unity is as essential today as it ever was, but we must face the facts of modern living. Should a member of a family owe a lesser duty with respect to the property rights or personal welfare of another member than he owes to a stranger? And why should not those rights be recognized and those duties enforced in our courts? We find nothing to support the claim that public policy prevents an unemancipated minor from recovering damages for the negligence of his unemancipated minor brother or sister." (Citations omitted.) Id., 654–55.

This court continued the assault on familial immunity in *Dzenutis* v. *Dzenutis*, supra, 200 Conn. 299–300, wherein the court concluded that parental immunity does not bar an action for personal injuries by an unemancipated minor against his parent when the accident occurs at a place of business. In *Dzenutis*, the court identified three factors that are relevant to whether the doctrine should block a child's cause of action against a parent: (1) whether the alleged negligent conduct of the parent was a matter of parental discretion; (2) whether the duty breached was owed to the public generally or only to the child; and (3) whether insurance *likely* existed to cover such a loss. Id., 295–301. Even under this three-prong test, the facts of the present case argue for denying the parent-child immunity defense: (1) the proper care and maintenance of the wiring in the house did not arise out of the relationship between the defendant and his daughter; (2) the proper care and maintenance of the wiring in the house was a duty that the defendant owed to the community generally, including neighbors and firefighters who might have suffered injury as the result of the fire; and (3)

insurance likely existed to cover losses occasioned by the defendant's negligence.

Most recently, in *Henderson* v. *Woolley*, 230 Conn. 472, 486, 644 A.2d 1303 (1994), we concluded that the doctrine of parental immunity does not bar an action by an unemancipated child against a parent for injuries resulting from sexual abuse, sexual assault or sexual exploitation.

We now find ourselves in the same position as the California Supreme Court in *Gibson* v. *Gibson*, supra, 3 Cal. 3d 918–19. Our decisions in *Brown, Bushnell, Overlock, Dzenutis* and *Henderson* have "whittled away" the rule of parent-child immunity, eroding the foundations upon which it purportedly rests. "[T]he reasoning of [prior] decisions has totally destroyed two of the three grounds traditionally advanced in support of . . . immunity: (1) disruption of family harmony and (2) fraud or collusion between family 'adversaries.' The third ground, the threat to parental authority and discipline, although of legitimate concern, cannot sustain a total bar to parent-child negligence suits." Id., 919.

In my view, the time is now ripe for this jurisdiction to abolish immunity in favor of the parent or the child.[10] It has become, as the California Supreme Court has found, "a legal anachronism"; id., 916; and its alleged purpose of preserving family tranquility is simply a legal fiction. What Justice Wheeler of this court had to say

---

[10] The majority claims in footnote 4 of its opinion that it leaves the question of whether the doctrine of parent-child immunity should be abrogated "for another day" because the plaintiff has not argued for abrogation of the doctrine in its entirety. I find this statement to be incredible and, from the point of view of the five year old child in this case who was badly burned, scarred, disfigured and otherwise injured, to be wholly unacceptable. This court can effect a change in the law with respect to the general subject matter raised by a party regardless of whether the party has raised the issue in its broad scope as long as the change effected pertains to the issue that the party raised.

almost seventy-five years ago with respect to advocating the abrogation of the rule that the release of one of several joint tortfeasors is a release of all is pertinent. "That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the legislature." *Dwy* v. *Connecticut Co.*, 89 Conn. 74, 99, 92 A. 883 (1915) (*Wheeler, J.*, concurring); also quoted in B. Cardozo, The Nature of the Judicial Process (1921) pp. 151–52.

In short, we should adopt the law as set forth in the Restatement (Second) of Torts, which provides: "A parent or child is not immune from tort liability to the other solely by reason of that relationship." 4 Restatement (Second), supra, § 895G (1). Abrogation of the doctrine would not mean that the relationship between parent and child is irrelevant with regard to an action predicated on negligence. Section 895G (2) of the Restatement (Second) points out that this repudiation of immunity "does not establish liability for an act or omission that, because of the parent-child relationship, is otherwise privileged . . . ." The privilege referred to in § 895G and discussed in §§ 147 through 155 of the Restatement (Second), entitled "Privilege to Discipline Children," however, is not applicable to this case.

What is appropriate in the present case is a determination of whether the conduct of the defendant was reasonable. "[A]lthough a parent has the prerogative and

the duty to exercise authority over his minor child, this prerogative must be exercised within reasonable limits. The standard to be applied is the traditional one of reasonableness, but viewed in light of the parental role. Thus, we think the proper test of a parent's conduct is this: *what would an ordinarily reasonable and prudent parent have done in similar circumstances?*" (Emphasis added.) *Gibson* v. *Gibson*, supra, 3 Cal. 3d 921; see *Nolechek* v. *Gesuale*, 46 N.Y.2d 332, 346, 385 N.E.2d 1268, 413 N.Y.S.2d 340 (1978) (Fuchsberg, J., concurring) ("[E]ach parent-child case [can] be decided by answering the broad question at the heart of negligence law: What would an ordinarily reasonable and prudent person—taking into account the parent-child relationship—have done in similar circumstances?").

I believe that we should adopt the California "reasonable parent" standard. The determination of whether an act was reasonable given the uniqueness of the parent-child relationship should be left to the proven competence of juries. Juries have a proven ability to understand what is reasonable and long have been applying the reasonableness standard in negligence actions. The mere fact that the action is between a parent and a child should not affect the jury's ability to arrive at the proper conclusion.

Accordingly, I dissent.