[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO STRIKE
In this case, an apportionment defendant, Dean Tine, has filed a motion to strike counts four through six of an apportionment complaint directed against him. Mr. Tine argues that the apportionment claims are bared by the doctrine of parental immunity and are thus precluded by the application of § 52-102b(c) of the General Statutes. In opposing the motion, counsel lays out a concise background to the legal issues before the court presented by the pleadings and the court will largely quote the language used.
The case arises out of a distressing motor vehicle accident that CT Page 12809 occurred in Montville, Connecticut. The underlying complaint alleges that the decedent, Seth Tine, died as a result of the motor vehicle accident and his brother, Colton Tine, sustained injuries as a result of the same accident. In a separate complaint, Dean Tine, the operator of the Tine vehicle involved in the accident, claims that he also sustained personal injuries. The defendant in both cases is the Estate of Melinda Mallory as well as her father, Richard Geiler, the owner of the vehicle that she was operating at the time of the incident. Melinda Mallory died as a result of the incident.
The defendants filed an amended apportionment complaint on June 1, 2000 containing six counts. The present motion to strike addresses counts four, five and six. Count four asserts that Dean Tine was negligent in not properly securing the car seat in which Seth Tine was a passenger at the time of the incident. It is further alleged that as a result of this negligence, Seth Tine sustained injury including his death. Count five asserts a cause of action in regard to the personal injuries sustained by Colton Tine as a result of the injuries suffered by Seth Tine and count six asserts a similar cause of action in regard to the emotional distress claim by Colton Tine. The apportionment defendant, Dean Tine, now moves to strike all three of these counts and the defendants now oppose this motion.
In essence, Dean Tine claims that as the parent of Seth and Colton Tine, he is immune from this suit.
The defendants oppose the motion on two basic grounds. They say given the facts, as alleged in the apportionment complaint, the failure to secure the child in a car seat, the parental immunity doctrine in common law terms should be held not to apply. Furthermore, they also argue that even if the doctrine were otherwise held to apply an exception to the application of this rule is to be found in § 52-572c of the General Statutes which provides:
 "In all actions of negligence in the operation of a motor vehicle resulting in personal injury, wrongful death or injury to property, the immunity between parent and child in such negligence actions brought by a parent against his (or her) child or by a child against his (or her) parent is abrogated."
Many of the issues involved in this case are discussed in a lengthy article in 6 ALR 4th 1066 et seq. "Liability of Unemancipated Child Caused by Parents' Negligence — Modern Cases." There are no Connecticut cases directly on point.
CT Page 12810 I
First, the count will assume that, given the factual allegations, the doctrine of F parental immunity would apply and try to determine whether, that being the case, § 52-572c abrogates the application of this doctrine. The question is whether the failure to properly secure the child, Seth Tine, in the car seat can be regarded as part of "the operation of a motor vehicle."
Both sides, in part, cite a number of Connecticut Appellate cases defining the term "operation of a motor vehicle" as used various statutes. Rivers v. Fox, 20 Conn. App. 619, 622 (1990) is cited by both sides. There, the plaintiff made a claim under § 52-556 of the General Statutes which allows an action against a state employee in derogation of sovereign immunity when it is established that the employee was "operating a motor vehicle." In Davey v. Pepperidge Farms, Inc.,180 Conn. 469 (1980), the court had to interpret the language "operation of a motor vehicle" as used in § 31-293 which allows suit against a fellow employee if the injury is caused by the negligent operation of a motor vehicle.
In Nichols v. Watson, 119 Conn. 637, 639 (1935), the court interpreted a statute which required a vehicle "operated at night upon the highways" to display lights as applying to a situation where a vehicle traveling on the highway stops momentarily. Id., 640. In State v. Swift, 125 Conn. 399
(1939), the police found a driver they claimed to have been intoxicated trying to start his car. The court, in effect, held that operating under the influence applies to a situation where a person sets "in motion the operative machinery of the vehicle as well as the driving of the vehicle." Id., 403.
These cases are of some value but they are not determinative of the issue now before the court since the definition of "operation" in a particular statute depends in large part on the policy objectives the statute was trying to accomplish — or to perhaps put it a better way, beyond the clear case where a person is actually driving a vehicle on the highway, it becomes a matter of policy objective as to whether acts, having nothing to do with actually driving a car, but incident to driving or attempting to drive ought to be defined as "operation" — the word "ought" is the problem and that requires an examination of statutory purpose.
Only two cases apparently have tried to interpret the meaning of "operating a motor vehicle" under § 52-572c, Ooms v. Ooms, 164 Conn. 48
(1972) and Jackson v. Johnson, 9 Conn. App. 290 (1986). In Jackson, a child was injured when she skated into the antenna of a parked car, the CT Page 12811 court held, citing State v. Swift, supra, and Nichols v. Watson, supra, that although "operation" has been held to include cases where a vehicle is parked incident to travel that was not what was involved in the case before it. Id., 292. In Ooms, the court held that in a situation where a child was injured by another car after leaving her mother's car, §52-572 (c) did not abrogate parental immunity. Regardless of whether the mother was negligent in the operation of her car by stopping it on the traveled portion of the highway, that is not the act which caused the child's injury. The cause of the injury was allowing the three-year-old to cross the street unattended — "these were two separate acts and it was clearly the latter act, in no way related to the operation of a motor vehicle, which directly resulted in the named plaintiff's injury."164 Conn. p. 51.
If one were to apply a purely linguistic analysis, and perhaps a simplistic one at that, it could be argued that the statute does not apply to abrogate parental immunity given the facts of this case. It says it shall apply "in all actions of negligence in the operation of a motor vehicle" and immunity is abrogated "in such negligence action brought . . . by or on behalf of a child against his parent." There is "operation" of a motor vehicle and negligent "operation" of a motor vehicle; the legislature did not say in all cases of injury "arising out of the operation of a motor vehicle" parental immunity shall not bar an action against the driver parent. Why did they use the word "negligence" to qualify operation and having done so, doesn't that indicate operation was meant to mean actual driving? In other words, why wouldn't the child have an action against the parent, at least theoretically, for the simple failure to secure the child in the seat belt apart from whether the parent was driving negligently or apart in fact whether either driver was negligent — that would have been accomplished by simply using the word "operation" or "arising out of the operation". Linguistic analysis is not very satisfactory, however, and it is best to analyze why our legislature might have passed § 52-572 (c) to determine what was meant by negligent operation. In the 6 A.L.4th 1066 article § 6 discusses numerous cases where "courts, while generally adhering to the parental immunity doctrine, have held or recognized that such doctrine was not applicable to actions arising from motor vehicle accidents, either by virtue of judicial construction or in conformity to modern statutes so providing," p. 1093.
The cases advance two reasons as to why statutes abrogating immunity for negligent operation of a motor vehicle and common law decisions to that effect came to be.
In Ledwell v. Berry, 249 S.E.2d 862 (N.C. 1978), the court said the state statute did not create an arbitrary classification to which CT Page 12812 parental immunity did not apply. The class was based on a reasonable distinction and reasoned that the legislature should be free to attack the "evils brought about by accidents on the highways without addressing the whole field of negligence actions." Id., 864. The case involved the negligent operation of a car and the statute applied to injury "arising out of the operation of a motor vehicle owned or operated by such parent." The court, in effect, said our state was concerned with negligent operation of cars on the roads in the sense of negligent driving. The Illinois courts reached the same distinction by holding that negligent operation of autos by parents is not inherent to the parent-child relationship since it does not involve parental decision making and discipline. Parental immunity did not bar a daughter's action against here father where she was injured because of his negligent driving, since the duty owed was one owed to the general public and not to his daughter as his child. That is the reasoning given by the court in Cates v.Cates, 619 N.E.2d 715, 729 (1993) for not applying parental immunity where the parents negligently operates, that is, drives his or her car, cf. Merrick v. Sutterlin, 610 P.2d 891, 893 (Wash. 1980), also seeJilani, et al v. Jilani, 767 S.W.2d 671, 673 (Tex. 1988), also seeSchneider v. Coe, 405 A.2d 682 (Del. 1979) where the court notes that it had earlier decided not to permit parental immunity for negligence arising from an auto accident because of the widespread existence of liability insurance, Id., 683, but also noted at page 684 that "the freedom of exercise . . . (parental control, authority and discretion) has constitutional underpinning and contrasts sharply with the State's supervision and regulation of the judgment one must exercise while driving an automobile." These cases then, for reasons of concern over public safety or analysis of what parental discretion means, confine abrogation of parental immunity to situations where there is negligent driving by the parent.
Another reason advanced for abrogating the doctrine where automobile accidents are involved is the widespread existence of liability insurance coverage. Williams v. Williams, 369 A.2d 669, 672 (Del. 1976); Smith v.Kauffman, 183 S.E.2d 190, 194 (Va. 1971); Lee v. Corner, 224 S.E.2d 721,724 (W.Va. 1976); Tranamerica Ins. Co. v. Royal, 656 P.2d 820, 823
(Mont. 1983). The position of these cases is reflected in Williams where the court, referring to one of the reasons for the adoption of the parent immunity doctrine in the first place says: "The most cogent rebuttal, however, of the domestic-discord justification is found in today's prevalence of liability insurance." In fact, as noted by one court where there is insurance family harmony may well be increased by permitting suit — an observation which strikes at the very raison d'etre of the doctrine; in any event, the court says in Sorenson v. Sorenson,339 N.E.2d 907, 913 (Mass)
CT Page 12813 "When an action is brought against a parent, frequently it will be brought at the instance of, or with the approval of, the parent with an eye toward recovery from the parent's already purchased liability insurance. When there is no insurance coverage it is unlikely that suit will be brought against the parent.
 In rare cases where the action is a true adversary one against a parent who refuses to contribute sufficiently to the support of a child and to the cure of the child's injuries, judicial formulation of an obstacle to the suit cannot contribute to family harmony or restore the proper relations among the members."
 Sorenson is cited with approval in Lee v. Comer, supra, which cites cases adopting the same reasoning and says of them: "The theme running throughout such cases is that where insurance exists an action against the parent is beneficial rather than detrimental to the family relationship; . . ." 224 S.E.2d at p. 724.
These, then, are the cases which set forth the basis of the exception to parental immunity in situations involving the negligent operation of a motor vehicle. Of what assistance are they in interpreting what our legislature should be taken to have meant by the use of the word "operation" in § 52-572 (c)?
The cases referring to the existence of liability insurance to protect policy holders from the consequences of the negligent operation in terms of driving on the highway cannot be safely relied upon to help define the word "operation" in our statute. Despite Dezenutis v. Dezenutis,200 Conn. 290 (1980), the later cases of Dubay v. Irish, 207 Conn. 518,524 (1988), and Ascuitto v. Farracielli, 244 Conn. 692, 708 (1998) have sharply reined in the use of the existence of insurance as a factor in determining the parameter of the parental immunity doctrine and presumably in using it as a factor in interpreting statutory language and apparent legislative intent.
Apart from the insurance factor, however, the court sees no good reason not to define "negligence in the operation of a motor vehicle" by relying on the way other jurisdictions have interpreted statutes analogous to § 52-572 (c) or have created common law exceptions to the doctrine where "operation" of a motor vehicle is involved. In other words, what those other courts and legislatures and our legislature was getting at when they used this language was injury or damage caused by the negligent CT Page 12814 operation in the sense of driving of a motor vehicle by the parent. The exception was created because it was felt in driving a motor vehicle, the parent owed duties of due care to the public at large not just to his or her child and, therefore, one of the reasons for the doctrine — desire not to interfere with the parent's interaction with the child — does not exist. Also as one of the cases suggests the "evils" of negligent operation in the sense of driving of cars on our highway is such that the legislature could have decided that the added deterrent of parental liability, when the child is injured by such activity, outweighs any policy considerations behind parental immunity.
In concluding this aspect of the analysis, the court should indicate that Dellapenta v. Dellapenta, 878 P.2d 1153 (Wy. 1992), cited by the defendants for the proposition that failure to secure a child in a seat, standing alone, is not a situation where parental immunity should apply if the child is injured thereby, provides some authority for, on the other hand, holding that when legislatures or courts talk about injuries suffered by the child due to the negligent operation of a car by the parent exception to parental immunity, they are talking about negligent driving of a car on the highways, period. See 878 P.2d pp. 1155-1158. At page 11 57, the court framed the problem in this way: "The question now becomes whether driving an automobile may be deemed an act of parental authority or discretion and this under the parental immunity umbrella?" The court went on to say in this regard that in Wyoming an action in automobile negligence will be allowed by a child against the parent.
The whole point of Dellapenta, for the purposes of this case, is that the court, after its automobile negligence remarks, was obligated to discuss the issue of the non-use of seat belts as providing no basis for a parental immunity claim because: "A jury found Mrs. Dellapenta not negligent in the operation of her motor vehicle and, therefore, not negligent in causing the accident." Id., 11 58 (emphasis by court) — that is not responsible for negligent driving. The court believes the interpretation given by other courts to "operation" as meaning actual driving of the car, period, makes sense and provides an explanation for what our legislature was getting at when it used the phrase "negligence in the operation of a motor vehicle" in § 52-572c.
In addition to the foregoing, the court must also confess that it has other concerns with the interpretation the defendants seek to give to the "negligence in the operation" language of § 52-572 (c). Juries are often told that when they enter the courtroom that common sense is not left outside the door. Was all the fore going abstruse reasoning really necessary to understand what the legislature might have meant when it used the language "negligence in the operation of a motor vehicle" and whether it intended to include in that definition the securing of a child CT Page 12815 in a safety seat? The court does not think so — the average intelligent lay person would understand operation of a motor vehicle as driving a motor vehicle on the highway, or at the least, trying to set it into motion or at a broad stretch, upon an instantaneous stop, failing to do something like leave the lights on. But failing to secure a child in a seat as "operation" would meet with a justifiably quizzical look.Ballentine's Law Dictionary, 3rd Ed has no difficulty defining "operating a motor vehicle" — in part, the definition says: "In common parlance, driving an automobile or other motor vehicle. Regulating and controlling the actual movements of the car, that is, having charge of it as a driver . . . Exercising control over the vehicle although not at the time in the driver's seat . . . Any manipulation of the manual or electrical equipment of a motor vehicle, which would, alone or in sequence set in motion the motive power . . . Not limited to a state of motion produced by the mechanism of the vehicle, but including at least ordinary stops upon the highway, such stops being fairly incidental to operation.
For all the foregoing reasons, the court concludes that if the doctrine of parental immunity were to apply to the facts of this case the language of § 52-572 (c) of the General Statutes cannot be regarded as an exception to the application of that doctrine.
 II
The more basic question is whether the doctrine of parental immunity should even be held to apply where the allegations are that the parent here, Dean Tine1 failed to secure the child in his seat which resulted in the injury and death of the child. Under § 14-100 (c)(1) of the General Statutes, the operator of a motor vehicle, whether or not a parent, is liable for an infraction for failure to have a child between four and sixteen restrained by a seat safety belt. Under these circumstances should the doctrine of parental immunity be held to apply? In order to answer this question, it might be useful to examine the reasons given by our court for the existence of the doctrine.
In the case of Dubay v. Irish, 207 Conn. 518, 527 (1988), the court said:
 "Courts should not unnecessarily involve themselves in the day-today exercise of parental discretion regarding the upbringing and care of children. To do so would undermine parental authority in the very personal endeavor of child rearing and inject the machinery of the state into an area where its presence might be the occasion for family discord "(referred to with approval in Crotta v. Home Depot, Inc., CT Page 12816 249 Conn. 634, 644 (1999)).
Picking up on the last quoted sentence from Dubay, the court inSqueglia v. Squeglia, 234 Conn. 259, 263-266 (1995) said . . . "there are few things more disruptive of familial harmony than a legal action by an unemancipated minor child against a parent." Also see Ascuitto v.Farracielli, 244 Conn. 692, 710-711 (1998).
The defendants have cited the case of Dellapenta v. Dellapenta,838 P.2d 1153 (Wy. 1992). There, the defendant mother's car slid off the road, one child was injured, one was killed, both children and the mother were not wearing seatbelts. In that case, the Wyoming Supreme Court held that "the exercise of parental authority and discretion must be afforded some latitude, we cannot license the disregard of known life-saving precautions through the failure to restrain children with seat belts by encompassing this dereliction as an exception to the abrogation of parental immunity." Id. 11 60. The Wyoming seatbelt statute was not in effect at the time of the accident so the decision created what was in effect a common law exception to the doctrine of parental immunity. In its opinion, the court cited and stressed statistics and studies showing the dangers presented by the failure to use seatbelts.
Dellapenta would have been better off abolishing the parental immunity doctrine altogether as many commentators and statutes and cases from a growing number of jurisdictions suggest is the right solution to a growingly exception ridden doctrine cf. Cates v. Cates, 619 N.E.2d 715,722 (1993). Instead, what the Dellapenta court did was to say that we will keep the doctrine but when the breach of duty by the parent causing the child injury is really really bad then the trial courts may abrogate the doctrine of parental immunity in a particular case. This will lead to a conflict in trial courts as to what exceptions should be carved out to the doctrine as they merrily skip through the field of tort law looking for the really disturbing case of parental neglect, and then everything will wait upon decision of the Appellate Court to see if the guess was right. This court does not accept the Dellapenta analysis as a reason to abrogate parental immunity under the facts of this case, on the basis of a common law analysis.
Interestingly, however, Dellapenta and Thurel v. Varghese, 621 N.Y.2d 633
(N.Y.AD, 1995) though they reach a contrary result on the abrogation of parental immunity, suggest in dicta that if the legislature had passed a statute mandating at least the operators of motor vehicles to secure children in seatbelts that might be a sufficient basis to abrogate parental immunity if the statute was in effect at the time of the accident.
CT Page 12817 As indicated, we do have a statute which mandates child restraint by operators of motor vehicles (§ 14-100a). This statute, it could be argued, sets forth clear legislative policy on the importance of having children wearing seatbelts failure to properly secure seatbelts can result in the imposition of an infraction fine and, for example, allows state and local police to stop motor vehicle operators if they notice a failure to comply with the statute. That clearly expressed policy can be held to override the goals sought to be achieved by the common law doctrine of parental immunity just by the mere passage of § 14-100a. Beyond that, the fact that such an act has been passed suggests that the reasons for enforcing parental immunity where parent operators do not secure their children in seats are not justified by the reasoning used by the courts to support that doctrine. In other words, the legislature by diktat has removed the decision on whether children to wear seatbelts from the area of "parental discretion regarding the upbringing of children" and the "machinery of the state" has already been interjected in this type of parental activity or failure to act. See Dubay v. Irish,
supra.
It is true that the other ground for parental immunity — to avoid the disruption to family harmony by permitting law suits by the child (cf. Squeglia v. Squeglia, supra — still exists even with the foregoing analysis. But one of the supports of the doctrine is removed and legislative policy as expressed in § 14-100 is a strong one; the state on its own intervenes with possible legal action for the parental operators failure to secure the child.[1]
But the problem with using the foregoing analysis to bar operation of parental immunity is the statutory language in subsection (4) of §14-100a that says "Failure to wear a seat safety belt shall not be considered as contributory negligence nor shall such failure be admissible in evidence in any civil action." Even Dellapenta suggested it would have considered Wyoming's statute barring evidence of seatbelt non use in its analysis if the statute had been in effect at the time of the accident; the court said it would not do so retroactively and decided that it "agree(d) (absent a statute) with those courts that would allow the introduction of evidence where an offer of proof is made to show a casual relationship between non use an injuries to the occupant."838 P.2d at p. 1162.
 III
One other matter should be referred to, applying to the fourth count brought on behalf of the deceased child, which was not argued or mentioned by the parties. To put it in the starkest terms it has been said that: "Since the purpose of the intrafamily immunity rule is to CT Page 12818 protect the family relationship, some courts take the view that the rule no longer applies when the relationship has been already ended by the death . . . of the child. But there are a number of decisions to the contrary." 59 Am.Jur.2d "Parent and Child" § 146; also see 6 ALR 4th 1066, § 7, pp. 1096-1101, "Parent's Liability — Injury to Child." There are, as noted, fifteen Appellate cases discussing parental immunity; this issue has not been discussed and, in fact, none of F the fifteen cases appear to be wrongful death actions. Analytically there is reason to say that if the child dies then the bar presented by parental immunity should fall. Thus, in Henderson v. Woolley, 230 Conn. 472 (1994) the court held parental immunity would not bar an action by a minor against a parent for personal injuries arising out of a sexual abuse, assault or exploitation. The court reasoned that the "purpose of the doctrine" would not be served by barring such an action: "Familial discord or dysfunction obviously exists were parental sexual abuse occurs." Id., at p. 482. When the child dies, family dysfunction and antagonism regarding the actions of that child no longer are operative. The policy reasons for the doctrine cease to exist, see Johnson v.Myers, 277 N.E.2d 778 (Ill. 1972). Such a result might be considered odd in the sense that the tortfeasor or parent, not the deceased child, would presumably benefit as a result of his or her own negligence. In any event, the court is reluctant to rely on this exception to parental immunity — i.e. the death of the child. Section 52-572c, for example, when abrogating parent-child immunity in operation of motor vehicle cases barred operation of the doctrine "in all actions" (of the type mentioned) . . . resulting in personal injury, wrongful death or injury to property . . ." (emphasis added). The legislature certainly assumed the doctrine would apply in a wrongful death situation.
The doctrine of parental immunity is the law in our state and it has been so held as recently as 1999, Crotta v. Home Depot, Inc., 249 Conn. 634
(1999). No valid exception to its operation can be found by the court, therefore, the court is constrained to grant the motion to strike.
Corradino, J.